# Locke's Appeal.

## Commonwealth *ex rel.* McClain *versus* Locke *et al.*

1. An agent cannot delegate to another a power conferred on him because of his fitness and the confidence reposed in him.

2. A legislature in a representative government cannot delegate to another body the power to make laws.

3. Whilst a legislature calls to its aid only the means of ascertaining the utility of a measure, and does not delegate the power to make the law, it is acting within its powers.

4. An act authorized voters to vote "for license" or "against license," the tickets to be counted and return certified to the Quarter Sessions; the

| 72 | 491 |
| --- | --- |
| 166 | 77 |

| 72 | 491 |
| --- | --- |
| f 209 | ¹331 |
| 209 | ⁴332 |
| e 24 SC | ²647 |
| 24 SC | 648 |
| d 24 SC | ²649 |
| j 24 SC | ⁴651 |
| j 24 SC | ⁴652 |

| 72 | 491 |
| --- | --- |
| f 32 SC | 55 |

[Locke's Appeal.]

voting, &c., to be conducted as in other elections; when the returns showed a majority against license, it should "not be lawful for any license to issue for the sale of intoxicating liquors," &c. Any person who should be convicted of selling any intoxicating liquors without a license, should be sentenced, &c. *Held*, that the act was constitutional.

5. Commonwealth *v.* Judges, 8 Barr 391; Moers *v.* Reading, 9 Harris 188; Smith *v.* McCarthy, 6 P. F. Smith 359, followed. Parker *v.* Commonwealth, 6 Barr 507, overruled.

February 24th and 25th 1873. Before READ, C. J., AGNEW, SHARSWOOD, WILLIAMS and MERCUR, JJ.

Appeal from the Court of Common Pleas of *Philadelphia :* In Equity : No. 52, to January Term 1873.

The questions in this case arose under the Act of May 3d 1871, Pamph. L. 522, relating to granting licenses to sell intoxicating liquors. The parts of the act material to the case are as follows:

"Sect. 1. That at the next municipal election in the Twenty-second ward of the city of Philadelphia, and at the annual municipal election every third year thereafter, it shall be the duty of the inspectors and judges of election —— said ward, to receive tickets, either written or printed, from the legal voters of said ward, labelled on the outside, license, and on the inside, for license or against license, and to deposit said tickets in a box provided for that purpose by said inspectors and judges, as is required by law in case of other tickets received by said election; and the tickets so received shall be counted, and a return of the same made to the clerk of the Court of Quarter Sessions of the city and county of Philadelphia, duly certified by the return judges of said ward, which certificate shall be filed with the other records of said court.

"Sect. 2. It shall be the duty of the constables of the said ward to give due public notice, by printed handbills, throughout the ward, of such special election above provided for, thirty days previous to the time of holding the next annual municipal election, at which time the question of license or no license will be submitted to the voters of said ward; also, thirty days' notice for the annual municipal election every third year thereafter.

"Sect. 3. That in receiving and counting, and in making returns of the votes cast, the inspectors, judge and clerks of said election shall be governed by the laws of this Commonwealth regulating general elections; and all penalties of said election laws are hereby extended to, and shall apply to the voters, inspectors, judges and clerks acting at and in attendance upon the elections held under the provisions of this act.

"Sect. 4. Whenever, by the returns of election in the Twenty-second ward of the city of Philadelphia, it shall appear that there is a majority against license, it shall not be lawful for any license to issue for the sale of spirituous, vinous, malt or other intoxicating liquors in said ward, at any time thereafter, until at an election as

[Locke's Appeal.]

above provided, a majority of the voters of said ward shall vote in favor of a license.

" Sect. 5. Any person who shall hereafter be convicted of selling, or offering for sale, in the Twenty-second ward of the city of Philadelphia, any intoxicating liquors, spirituous, vinous, malt or other intoxicating liquors, without a license, shall be sentenced to pay a fine of $50, and confinement in the house of correction or county jail for the period of six months for the first offence, and for the second and each subsequent offence, a fine of $100, and confinement in the house of correction or county jail for the period of one year."

An election under the provisions of the act was held in the Twenty-second ward, and a majority of votes having been cast against granting license, a bill in equity was filed in the Court of Common Pleas against Thomas Locke, James Bain and Alexander McCuen, city commissioners, to restrain them from granting license to any person to sell intoxicating liquors in the Twenty-second ward.

The court granted the injunction; the commissioners appealed to the Supreme Court, and assigned for error the decree granting the injunction.

The question discussed was the constitutionality of the Act of May 3d 1871.

*G. W. Biddle* and *W. L. Hirst*, for plaintiffs in error.—The legislature cannot delegate to the people power to enact new laws or to repeal existing laws which affect the property or bind the political or social rights of the citizen : Cooley's Constitutional Limitations 116, 117; Rice *v*. Foster, 4 Harrington 492; Parker *v*. Commonwealth, 6 Barr 507; People *v*. Stout, 23 Barb. 338; Barto *v*. Himrod, 8 N. Y. Rep. 483; State *v*. Swisher, 17 Texas 441; The Aurora *v*. United States, 7 Cranch 382; Thorne *v*. Cramer, 15 Barbour 112; Bradley *v*. Baxter, Id. 122; Johnson *v*. Rich, 9 Id. 68.

The authorizing municipal corporations to do certain acts, such as to contract particular debts, to subscribe to improvements, to impose taxes for local purposes, to pass by-laws, ordinances, &c., is no delegation of the law-making power, provided that no act thus authorized abridges or enlarges any of those rules of conduct that affect the social and political rights of a citizen : when they do so the law is *pro tanto* unconstitutional : Comm'th *v*. Judges of Quarter Sessions, 8 Barr 395; Parker *v*. Comm'th, *supra;* Comm'th *v*. Painter, 10 Barr 391; Cooley on Constitutional Lim. 116, 125; Commissioners *v*. Gas Co., 2 Jones 318; Ex parte Burnett, 30 Ala. 461; s. c. 32 Id. 728; Thorne *v*. Cramer, Bradley *v*. Baxter, Barto *v*. Himrod, *supra;* People *v*. Stout, 23 Barb. 338; State *v*. Copeland, 2 Rhode Island 30;

[Locke's Appeal.]

Maize *v.* State, 4 Ind. 351 ; Santo *v.* State, 2 Iowa 206 ; Geebrick 5 Id. 493 ; People *v.* Collins, 3 Mich. 415 ; State *v.* Parker, 26 Verm. 336.

An act making it wholly illegal and penal to carry on a business lawful at common law, is a law affecting the property and the social and political rights of the citizen. The legislature cannot delegate the power to pass or repeal such a law, to any other body, much less to the people of a local district : Moers *v.* Reading, 9 Harris 188 ; Railroad *v.* Clinton Co., 1 Ohio N. S. 77 ; Ex parte Burnett, *supra.*

*W. H. Rawle* and *Porter* (with whom were *W. McElroy* and *F. C. Brewster*), for appellants.—An act of the legislature is not to be declared void, unless the violation of the Constitution is so manifest as to leave no room for reasonable doubt : Com. *v.* Smith, 4 Binn. 117 ; Hilbish *v.* Catherman, 14 P. F. Smith 154 ; Bancroft *v.* Dumas, 21 Verm. 461 ; Wellington *v.* Petitioners, 16 Pick. 95 ; Respub. *v.* Duquet, 2 Yeates 493 ; Com. *v.* Zephon, 8 W. & S. 382 ; Sharpless *v.* The Mayor, 9 Harris 147 ; Speer *v.* School Directors, 14 Wright 158 ; Erie R. R. *v.* Casey, 2 Casey 287 ; Durach's Appeal, 12 P. F. Smith 495 ; Pennsylvania Railroad *v.* Riblet, 16 Id. 164.

This kind of law is a police regulation, being applicable only to a business which is hazardous or injurious to the citizens : People *v.* Hawley, 3 Mich. 330.

A writ of error to the same court by the Commonwealth at the relation of McClain and others, against Locke and others, city commissioners, was argued at the same time.

The error assigned in that case was the refusal of the court below to issue a mandamus to compel the commissioners to issue license to the relators.

The opinion of the court was delivered, March 17th 1873, by

AGNEW, J.—That a power conferred upon an agent because of his fitness and the confidence reposed in him cannot be delegated by him to another, is a general and admitted rule. Legislatures stand in this relation to the people whom they represent. Hence it is a cardinal principle of representative government, that the legislature cannot delegate the power to make laws to any other body or authority. The true question in this case is, whether the Act of May 3d 1871 (Pamph. L. 523), " to allow the voters of the Twenty-second ward of the city of Philadelphia, to vote on the question of granting license to sell intoxicating liquors," is a delegation of *legislative* power. This must be determined by an analysis of the provisions of the act itself; and depends, not upon the numerical order of the sections, but upon the nature of the legislative determination when the act left the hands of the Assembly. Whatever the legislature *then* determined *to be* is *law,* for so

much was then a fixed and absolute resolve. What did the legislature then determine absolutely? It enacted in the fifth section that any person who shall hereafter be convicted of selling, or offering for sale, in the Twenty-second ward of the city of Philadelphia, any intoxicating liquors, spirituous, vinous, malt or other intoxicating liquors, without a license, *shall* be sentenced to pay a fine of fifty dollars," &c. The provisions of the first, second and third sections are equally imperative and absolute, and may be summed up in a few words, viz.: That a special election *shall* be held in the Twenty-second ward at the next annual municipal election, and every third year thereafter; that the constable of the ward *shall* give a certain notice of such special election, at which time the question of license or no license *will* be submitted to the voters of this ward; that the election *shall* be held by the same officers, in the same manner, and under the same penalties prescribed by the general election law, and due returns of the election made in a similar manner. The language is imperative, and the law was absolute in all these respects when the act was approved by the governor. We come then to the fourth section, which provides that whenever, by the returns of election, it shall appear that there is a majority against license, *it shall not be lawful* for any license to issue for the sale of spirituous and other liquors in said ward, at any time thereafter, until at an election, as above provided, a majority of the voters of said ward shall vote in favor of a license.

What did the legislature, in this section, submit to the people, and what did they not submit? This is quite as clear as any other part of the act. Each elector is to vote a ticket *for* license or *against* license. He is allowed by the law to say, " I am for the issuing of license," or " I am against the issuing of licenses," and thus to express his judgment or opinion. But this is all he was permitted by law to do. He declared no consequences, and prescribed no rule resulting from his opinion. Nor does the majority of the votes declare a consequence. The return of a majority is but of a mere numerical preponderance of votes, and expresses only the opinion of the greater number of electors upon the expediency or inexpediency of licenses in this ward. When this is certified by the return, the legislature, not the voters, declare " it shall (or it shall not) be lawful for any license to issue for the sale of spirituous liquors." Thus it is perfectly manifest this law was not made, pronounced or ratified by the people; and the majority vote is but an ascertainment of the public sentiment —the expression of a general opinion, which, as a fact, the legislature have made the contingency on which the law shall operate. When the law came from the halls of legislation it came a perfect law, mandatory in all its parts, prohibiting in this ward the sale of intoxicating liquors without license; commanding an election

[Locke's Appeal.]

to be held every third year to ascertain the expediency of issuing licenses, and when the fact of expediency or inexpediency shall have been returned, commanding that licenses shall issue or shall not issue. Then what did the vote decide? Clearly, not that the act should be a law or not be, for the law already existed. Indeed, it was not delegated to the people to *decide* anything. They simply declared their views or wishes, and when they did so, it was the *fiat* of the law, not their vote, which commanded licenses to be issued or not to be issued.

Now, in what respect does a vote upon license or no license, in a particular ward or township, differ from a vote, whether a new township shall be continued or annulled; or from a vote to determine whether a seat of justice shall be continued where it is or be removed to another place; or from a vote for or against a subscription by a city to the stock of a railroad company; or from a vote of the people of a district for or against a consolidation of it with a city? Yet in all these instances (to which reference will be made hereafter) it has been decided that the determination of these questions by a vote of the people interested in them, and an enactment of law dependent on the result of this vote, are not a delegation of the law-making power to the people, but a submission only of the expediency of the proposed measure. This is simply common sense, for in none of the instances did the legislature commit to the people the making of the law, but merely the province of determining a matter important to wise and judicious legislation—something upon which the legislature deemed it proper its own act should wait, and then should operate accordingly. The wit of man cannot draw a well-grounded distinction between the result of a vote upon license in a township, and the result of a vote upon the existence of a township, and the removal of a court-house, or a subscription to stock, or the consolidation of an outlying district with a city.

The legislature in the Act of 1871 have given to the people a *law*, not a mere *invitation;* needing no ratification, no popular breath to give it vitality. The law is simply contingent upon the determination of the fact, whether licenses are needed, or are desired, in this ward. And why shall not the legislature take the sense of the people? Is it not the right of the legislature to seek information of the condition of a locality, or of the public sentiment there? The Constitution grants the power to legislate, but it does not confer knowledge. The very trust implies that the power should be exercised wisely and judiciously. Are not public sentiment and local circumstances just subjects of inquiry? A judicious exercise of power in one place may not be so in another. Public sentiment or local condition may make the law unwise, inapt, or inoperative in some places, and otherwise elsewhere. Instead of being contrary to, it is consistent with, the genius of our

[Locke's Appeal.]

free institutions, to take the public sense in many instances, that the legislators may faithfully represent the people, and promote their welfare. So long, therefore, as the legislature only calls to its aid the means of ascertaining the utility or expediency of a measure, and does not delegate the power to make the law itself, it is acting within the sphere of its just powers.

It is urged that Parker *v.* Commonwealth, 6 Barr 507, decided the question before us. That case was overruled soon after it was decided, not in express terms, it is true, but its foundation was undermined when it was held that laws could constitutionally be made dependent on a popular vote for their operation. The reasoning in Parker *v.* Commonwealth is fallacious, in assuming the fact that there was a delegation of legislative power. There is much in the opinion well and ably said. The first eight pages may be passed over, and we are brought then to the marrow of the argument, which is contained in the following sentences : After a summary of the Act of 1846, Justice Bell proceeds to say, that as a *statute* it " depends for its *validity* and *binding efficacy,* within the several counties named in it, upon the popular vote of designated districts." " Possessing no *innate* force, it remains a *dead letter until breathed upon by the people,* and called into activity by an exertion of their voice in their primary assemblies." " If a majority within the particular district should vote negatively upon the question yearly to be submitted to the people, *the act as a statute has no existence.*" " If a majority of the votes be cast in the affirmative, *then the act is to take effect as a statute.*" " It operates *not proprio vigore,* but, if at all, only by virtue of *a mandate expressed subsequently* to its enactment, in pursuance of an *invitation* given by the legislative bodies." " *As it left the halls* of legislation it was *imperfect and unfinished ;* for it lacked the qualities of command and prohibition absolutely essential to every law." I have italicised the portions which show the thought of the opinion and evince the assumption on which the argument rests. If we admit the fact that the law now before us was of this character, an imperfect and unfinished act, a mere invitation to the people to issue their subsequent mandate, and to breathe into it all its vitality, and thus give to it all its validity and binding efficacy as a law, we might have to concede the conclusion that there was a delegation to the people of the power to legislate. But it is beyond cavil that when the Act of 1871 left the halls of legislation, it was a mandatory law in all its parts, and the only thing committed to the people was to vote for or against the issuing of licenses, and thereby supply the evidence of expediency. It acts *proprio vigore,* and is called into existence by no subsequent popular mandate. By its command the sale of liquors is forbidden, the popular vote is taken, and its effect declared. This popular vote is but the law's appointed means of determining a result,

22 P. F. Smith—32

which the law enacts, in an alternative form, shall be the contingency of its operation. The law did not spring from the vote, but the vote sprang from the law, and the law alone declared the consequence to flow from the vote. The assumption that the act is not a law, till enacted by the people, is the foundation of the argument, and with its fall the superstructure vanishes. The character of this law is precisely that of hundreds of others, which the legislative will makes dependent on some future act or fact for its operation. To assert that a law is less than a law because it is made to depend on a future event or act, is to rob the legislature of the power to act wisely for the public welfare, whenever a law is passed relating to a state of affairs not yet developed, or to things future, and impossible to be fully known. Such an assertion attacks even the moral government of the Creator. God breathes into his creature the power of judgment and discretion, and then declares to him in his law: "As you determine your act, so shall be the consequence." The law is active and operates only when man determines. Does man or God make the law?

What is more common than to appoint commissioners under a law to determine things upon the decision of which the act is to operate in one way or another? The courts exercise powers dependent on their own discretion. Take the case of granting a license to keep an inn and sell liquor. The judge determines whether the license is necessary, and if not necessary, the law says to the applicant, "no license." The law takes effect just as the judge determines, yet who says it is the court that legislates? What is the difference, in essence, whether the necessity for places for the sale of liquors be determined by the people or the court? Each in its place, is but an instrumentality of the law. The judge speaks, the people speak; but each speaks by the authority of law, and the law commands the consequence. The error of the argument is in attributing the consequence to the voice that speaks, instead of to the law, which makes the people its own mouth-piece, and has beforehand proclaimed the consequence of the utterance. The people, by virtue of the law, declare the expediency of licenses in the ward, and the law itself has already enacted what shall follow this declaration. Though contingent in form, the law is mandatory throughout in all it requires, and all it determines. That is not less an act of sovereign power, which says to the subject, do this, and that shall follow; do that, and another thing shall follow. To the subject a discretion of acting is given, and as he decides, the law pronounces the consequences. It is the sovereign which gives the law, not the subject.

Then, the true distinction, I conceive, is this: The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend.

[Locke's Appeal.]

To deny this would be to stop the wheels of government.   There are many things upon which wise and useful legislation must depend, which cannot be known to the law-making power, and must, therefore, be a subject of inquiry and determination outside of the halls of legislation.   Hence the necessity of the municipal divisions of the state into counties, townships, cities, wards, boroughs and districts, to which is committed the power of determining many matters necessary, or merely useful, to the local welfare. Can any one distinguish between committing the determining power to the *authorities* of the district, and to the *people* of the district ?   If the power to determine the expediency or necessity of granting licenses to sell liquors in a municipal division, can be committed to a commission, a council, or a court, which no one can dispute, why cannot the people themselves be authorized to determine the same thing ?   If a determining power cannot be delegated, then there can be no power delegated to city councils, commissioners, and the like, to pass ordinances, by-laws and resolutions in the nature of laws, binding and affecting both the persons and property of the citizens.   If a determining power cannot be conferred by law, there can be no law that is not absolute, unconditional and peremptory ; and nothing which is unknown, uncertain and contingent can be the subject of law.

If in any case a question could arise upon a delegated power, it would be in that which is delegated to the Councils of Philadelphia to make *laws* so called.   Look at the language of the 16th section of the Act of March 11th 1789 : " The Mayor, &c., shall have full power and authority to *make*, ordain, constitute and establish such and so many *laws* or ordinances," &c.   See also the 4th section of the Consolidation act of Feb. 2d 1854 : " That the *legislative* powers of the said city shall be vested in two bodies, to be called the Select and Common Councils."   In pursuance of this power rights of person and property are regulated ; fines and forfeitures inflicted, and discretionary powers are vested in committees, departments and officers.   Can there be a clearer instance of the exercise of powers in their nature legislative, by an act of delegation ?   Yet who believes that this is unlawful, or that it is really a delegation of the law-making power in the sense of a relegation of it from the halls of legislation to the council chambers ?   On the contrary, the charter of the city is itself the law, which breathes into these *quasi* legislative acts of councils all their life and power, and which, for useful and necessary local purposes, delegated to councils, not the power of making laws, but the discretion and determining power necessary to regulate the affairs of a great city, that owing to distance, and want of knowledge and of time, the legislature cannot determine for itself, but which by its *law* it directs to be done by others.   Just at this point the opinion in

[Locke's Appeal.]

Parker *v.* Commonwealth evidently labors when it touches this instance of delegated powers, and attributes the efficacy of corporation laws to the consent of the citizens, and affirms that the relation between the municipality and the members is founded in contract.   But it is too clear for argument that ordinances derive their binding force from the law which authorizes them, and not from compacts.   The power to pass them is delegated, and the true question is, what is the nature of the delegated power ?   As already stated, it is merely a determining power, as to matters committed to the discretion of the councils by law, not a law-making power *per se.*

Parker *v.* Commonwealth was decided by three judges to two, with a strong dissent proceeding from the latter.   In less than a year afterwards a question arose upon a law, authorizing the people to determine by a vote, whether a new township should be continued or annulled : Commonwealth *v.* Judges Q. S., 8 Barr 391.   The only attempt to distinguish the case from Parker *v.* Commonwealth, was by saying that in the latter there was an exercise of sovereignty—of the power of enacting a law by ballot ; while in the former there was an exercise of a subordinate function only, for the convenience of public business.   But we have already shown that the distinction rests on no difference, and the assumption in Parker *v.* Commonwealth of the delegation of a legislative power being unfounded, the argument fails, and the distinction, in The Commonwealth *v.* The Judges, falls with it. The Commonwealth *v.* Painter, 10 Barr 214, occurred a year later, the law authorized the electors of Delaware county to determine by ballot whether the seat of justice should be continued at Chester or be removed to another place, and in the event of a vote for removal, that a commission should select the site, and a court-house be erected.

The law was held to be constitutional, the court not attempting to distinguish it from Parker *v.* Commonwealth, excepting to say that the latter does not reach or cover the case in hand.   The law, however, was examined in view of Parker *v.* Commonwealth, and the opinion was delivered by Coulter, J., who had written an able dissenting opinion in that case.   Four years later came Moers *v.* City of Reading, 9 Harris 188.   The law provided for taking the sense of the people upon a subscription to the stock of the Lebanon Valley Railroad Company, the subscription being authorized or not as the people should declare by their vote.   The law was held to be constitutional, Ch. J. Black remarking : " It is argued that it is not an exercise of legislative power by the Assembly, but a mere delegation of it to the people of Reading.   We cannot see it in that light.   Half the statutes on our books are in the alternative, depending on the discretion of some person or persons, to whom is confided the duty of determining whether the

proper occasion exists for executing them. *But it cannot be said the exercise of such a discretion is the making of the law.*" This is the precise point which we have endeavored to show was overlooked in Parker *v.* Commonwealth, and the contrary assumed without proof. It is to be noticed, also, that Moèrs *v.* City of Reading was decided by an entirely new bench of judges. These cases have been followed very recently in Smith *v.* McCarthy, 6 P. P. F. Smith 359. A law for consolidating certain outlying districts with the city of Pittsburg was made to depend upon the vote of the people. It was held to be constitutional, Thompson, C. J., remarking, "We do not regard it within the principle which forbids the delegation of legislative power." There was also the common school system of the state, which, by the Act of the 13th June 1835, § 13, was made dependent upon the vote of the people of every district, by election every third year. In many parts of the state, the hostility to the law was intensely bitter and the school law was not adopted in some districts for more than twenty years, yet it has never been declared unconstitutional.

I have not thought it useful or necessary to notice the supposed distinction between acts of the legislature as *laws* and as *grants* of sovereign prerogative, for the plain reason, that having by analysis of the act itself and by abundant precedents shown, that it is a *law* in its nature and mandatory character, the distinction has no place or application. If it were useful it might not be difficult to show that, in our form of government, all grants of royal prerogative or of franchise are the product of the exercise of the legislative power only, and by the terms of the Constitution, in the 1st section of the 1st article, must pass by the grant of the legislative power therein, or not at all. The legislature cannot delegate the power of passing laws relating to these subjects, more than they can delegate the power to legislate on other subjects.

Nor have I thought it necessary to refer to the decisions in other states, for the plain reason, also, that our own decisions, since Parker *v.* Commonwealth, rule the case; while that case was the forerunner of the decisions in all the other states (except Delaware), and with its fall they have lost their chief prop and support.

Decree affirmed and special injunction ordered to remain.

READ, C. J.—Nearly twenty-six years ago this court held in Parker *v.* The Commonwealth, 6 Barr 507, the Act of 7th April 1846, entitled "An Act authorizing the citizens of certain counties to decide by ballot, whether the sale of vinous and spirituous liquors shall be continued in said counties," to be unconstitutional and void. The opinion delivered by Judge Bell was a very able one, and was concurred in by Chief Justice Gibson and Judge Rogers. " Mindful," says Judge Bell, " of the ancient institutions of the country, and following the example set by the Federal Con-

[Locke's Appeal.]

stitution, the people of Pennsylvania, when ordaining and establishing a fundamental law for the government of the Commonwealth, decreed that the legislative power *shall* be vested in a General Assembly, to consist of a Senate and House of Representatives, to be elected at stated periods, by the citizens of the respective counties. They thus solemnly and emphatically divested themselves of all right directly to make or declare the law, or to interfere with the ordinary legislation of the state, otherwise than in the manner pointed out in Article IX., section 20, which declares, 'the citizens have a right, in a peaceable manner, to assemble together for their common good, and to apply to those invested with the power of government for the redress of grievances or other purposes, by petition, address or remonstrance.' This provision, which found a place in the Constitution of 1790, is reiterated and re-established by the amended Constitution of 1838, adopted by a vote of the whole people ; thus conclusively showing, that the experience of nearly half a century had worked no change in the sentiment which lodged the legislative authority of the Commonwealth in *selected and responsible bodies of men*, liable to the *animadversions* of their constituents, as the only safe depository of this portion of the sovereign power. Desiring to interfere no further with the regulated action of these bodies, than in the mode thus expressly reserved, by the right of selecting the delegates composing them, and through the influence which inevitably flows from enlightened public opinion, deliberately and temperately expressed, the people sought to guard against an abuse of the high power they had delegated, by providing a specific mode of election of members of the Senate and House of Representatives by prescribing their qualifications, by stipulating the separate and independent action of the two chambers; by an appeal to the conscience in the oath or affirmation exacted from each member to support the Constitution of the Commonwealth, and to perform the duties of his office with fidelity ; and by conferring on the chief executive magistrate the prerogative of the *veto*, designed for the correction of hasty and inconsiderate legislation. The system so established is a system of checks and balances, seeking safety in the declared *responsibility* of the individual agent, and the guardian watchfulness of the co-ordinate branches."

This legislative power thus exclusively vested in the General Assembly, the court expressly held could not be delegated by the legislature, "not even to the people themselves; for they have forbidden it by the solemn expression of their will, that the legislative power *shall* be vested in the General Assembly ; much less can it be relinquished to a *portion* of the people, who cannot even claim to be the exclusive depositories of that part of the sovereignty retained by the whole community."

In 5 Watts & Sergeant 283, Chief Justice Gibson, in a few terse

words, expressed the true principle: "Under a well balanced Constitution, the legislature can no more delegate its proper function, than can the judiciary."

The legislature of Delaware had on the 19th of February 1847 passed an Act "authorizing the people to decide by ballot, whether the license to retail intoxicating liquors shall be permitted among them" (framed upon the plan of our Act of 7th April 1846), and under an election held under it in New Castle county, there was a majority against license. The question of its constitutionality came up before the Court of Appeals in June Term 1847, and is reported in Rice v. Foster, 4 Harrington's Reports 479. The court, after hearing a most elaborate and exhaustive argument, by very distinguished counsel, were *unanimously* of opinion that the law was unconstitutional, as it was a delegation of the law-making power to the people.

It is a striking fact, that two separate courts of the last resort in two adjoining states, whose Constitutions both provide that the legislative power of the state "shall be vested in a general assembly, which shall consist of a senate and house of representatives," in the same year should have decided on the same grounds the two similar laws to be unconstitutional and void. Two such decisions upon a constitutional question affecting the personal rights of the citizens, and their right to follow certain trades and business, should have an overwhelming authority on the case before us.

On the 3d of May 1871, an act was passed, entitled "An Act to allow the voters of the Twenty-second ward of the city of Philadelphia, to vote on the question of granting licenses to sell intoxicating liquors."

The first three sections simply provide the machinery for a vote at the next annual municipal elec on, and at the annual municipal election every third year thereaftc by the voters of the ward on the question of license or no license, by written or printed ballots.

The fourth section enacts, "that whenever by the returns of election in the Twenty-second wa d, it shall appear that there is a *majority against* license, it *shall not be lawful* for any license to issue for the sale of spirituous, vinous, malt or other intoxicating liquors in said ward, at any time thereafter, until at an election as above provided, a majority of the voters of said ward shall vote in favor of a license."

By whom is this law enacted? Clearly not by the legislature but by the voters, without discussion, and in secret, no man knowing how his next-door neighbor votes, nor his reason for casting his ballot as he has chosen to do. The question, therefore, of license or no license, is decided by a body whom the Constitution has stripped of all legislative power or authority. This is a legislative question purely, and must be decided by the legislative body itself, openly and publicly, and the yeas and nays may be called at the desire

of any two members, and be entered on the journals.   The question shall license be issued in the Twenty-second ward could only be decided by the legislative body, who *never* would have answered it affirmatively.   This act is therefore unconstitutional and void, and is covered by the two decisions of 1847.

The Act of 1846 embraced only vinous and spirituous liquors; the Act of 1871 extends it to malt or other intoxicating liquors, including lager beer, cider, and every possible liquor which may produce intoxication.   It is a *prohibitory* law, and is intended as an entering wedge to the stringent prohibitory laws of Vermont and Massachusetts.   But the fifth section, following up the prohibitory action under the fourth section, makes all sales of intoxicating liquors in the Twenty-second ward criminal offences, punishable with a fine of fifty dollars, and confinement in the house of correction or county jail for the period of six months for the first offence, and for the second and each subsequent offence, a fine of $100, and confinement in the house of correction or county jail for the period of one year.   Thus the unconstitutional surrender of legislative power to a small body of men, in a contracted locality, enables them to add new crimes to our criminal code, and to inflict on their fellow-citizens punishments of unwonted and uncalled-for severity.   Still further, the power to repeal the law thus enacted by the voters of the ward, is given to the voters every three years, one of the most important functions of a legislative body.

If this is be a constitutional enactment, why may not the legislature confer the power upon a minority of the voters, say one-fourth, or make it depend upon the ballot of a single voter?   If they can give the power to a majority they certainly can to a minority.

The cases cited in opposition to Parker *v.* Commonwealth bear no resemblance to that case, or to the one before us.   The case of the common school law was considered in Parker *v.* The Commonwealth, and distinguished, and the same decision was arrived at, as to a similar school law in Delaware, by the Court of Appeals in Rice against Foster.   The other cases as to the removal of county seats, the choice of sites for public buildings, or the subscriptions to railroad stock, are mere acts of executive administration, not laws.   The present case is one of morals, of a strong prohibitory character, proscribing certain trades and business heretofore lawful, creating new crimes, inflicting severe punishments, with a power of repeal, all dependent upon the votes of the citizens of the ward, whom the legislature has vested with the full law-making power.   The object is plain, to force total abstinence upon a population of 23,000 souls.   The legislature never would have passed such an act by a direct vote upon a call of yeas and nays.

In 1870, the population of the city was 674,020, which is rapidly increasing, and it is clear that a prohibitory law proscrib-

ing every fluid but the waters of the Schuylkill and the Delaware, cannot be enforced, and it is only necessary to look at the history of such legislation in Massachusetts and its capital, the city of Boston.

The first movement for entirely prohibitory liquor law was made in the state of Massachusetts, in the summer of 1847, and a petition for that purpose, numerously signed, was presented to the legislature at its next session in the winter of 1848. It was referred to a special committee, who reported a bill, which, though warmly supported, failed to become a law. In 1851, the legislature of Maine passed their prohibitory law, adopting the measure proposed in Massachusetts, with the addition of what is called the destruction clause. Massachusetts passed prohibitory statutes in 1852, 1855, and 1858; the two last of which were the foundation of chapter 86 of the general statutes of that state of 1860, "of the manufacture, sale, &c., of intoxicating liquors."

By this chapter 86 a commissioner is appointed annually, by the governor, with the advice and consent of the council, to purchase and sell spirituous and intoxicating liquors of a pure quality, to the several city and town agents, appointed under the provisions of this chapter, and to regularly appointed agents in cities and towns of other of the New England States, *and to no other person.* He is to establish a place of business in Boston, and all liquors kept for sale by him shall be analyzed by one of the state assayers, and his sales shall be made for cash, and at a price not exceeding an advance of five per cent. upon the actual cost, together with the cost of such analysis.

The mayor and aldermen, or selectmen of every city and town, are to appoint on the first Monday of May annually, for one year, one or more suitable persons as agents of such place, to purchase and sell spirituous or intoxicating liquors to be used in the arts, or for medicinal, chemical and mechanical purposes, *and no other*, and every agent must purchase of the commissioner.

Druggists may sell for medicinal purposes only, pure alcohol, to other druggists, apothecaries and physicians, known to be such. "A chemist, artist or manufacturer, in whose art or trade they may be necessary, may keep at his place of business, spirituous liquors for use, in such art or trade, *but not for sale;* and any person may manufacture or sell cider for other purposes than that of a beverage, and unadulterated wine for sacramental purposes."

"Ale, porter, strong beer, lager beer, cider and all wines, shall be considered intoxicating liquors, within the meaning of this chapter, as well as distilled spirits; but this enumeration shall not prevent any other pure, or mixed liquors, from being regarded as intoxicating."

The county commissioners, and the mayor and aldermen of the city of Boston, may, on the first Monday of May, annually,

[Locke's Appeal.]

authorize such persons as apply to them in writing, to manufacture spirituous or intoxicating liquors, and to sell the same in quantities not less than thirty gallons, to be exported, or to be used in the arts or for mechanical and chemical purposes in the state, such authority to continue for one year from the date thereof."

The 30th section provides penalties for all unlawful sales of spirituous or intoxicating liquors, and the 31st section provides that, "whoever is a manufacturer of spirituous or intoxicating liquor, or a common seller, in violation of the provisions of this chapter, shall for one violation, pay fifty dollars, and be imprisoned in the house of correction, not less than three nor more than six months; for a second violation, shall pay the sum of two hundred dollars, and be imprisoned six months in the house of correction; and for any subsequent violation, shall pay the sum of two hundred dollars and be imprisoned twelve months in the house of correction."

Provision is also made for searching for and seizing liquor intended for sale, forfeiting the same and selling what is suitable for medicines, chemical or mechanical purposes, and destroying what is unfit.

By the 61st section, "all payments or compensations for spirituous or intoxicating liquors, sold in violation of law, whether in money, labor or personal property, shall be held to have been received without consideration, and against law, equity and good conscience."

By section 60, "all intoxicating liquors kept for sale, and the implements and vessels actually used in selling and keeping the same, contrary to the provisions of this chapter, are declared to be common nuisances."

Under this statute and subsequent statutes intended to prevent the sale of all intoxicating liquor as a beverage, and limiting their sale to be used in the arts, or for mechanical and chemical purposes, or for medical purposes, a continued scene of litigation has been kept up during 41 volumes of the Reports of the Supreme Judicial Courts of Massachusetts, beginning with 11 Cushing. Every volume has its full share, and in one volume there are 36 cases growing out of this attempt to force its citizens to drink only water. These cases form a very large portion of the legal literature of Massachusetts, and exhibit the folly of forcing total abstinence by a law which is broken every day and every hour in the city of Boston.

It is notorious, that liquor may be had in every hotel, restaurant, and oyster saloon in Boston. The law is in fact a dead letter, the evil being to encourage deception, falsehood and fraud, and to accustom citizens to a daily violation of law.

Messrs. Reuter & Alley, of Boston, are the most extensive brewers in the United States, producing 118.000 barrels of ale per annum.

[*Locke's Appeal.*]

In a very able article in the British Quarterly Review for April 1872, on the licensing system, written by a true friend of temperance, we find the following : " Boston is the chief city of the state of Massachusetts, in which the sale of intoxicating liquor is prohibited. When an investigation was set on foot, into the working of the prohibitory law in Boston, it was found that there were about 2000 places where liquor could be obtained. The author of a new and interesting book on the United States, says, with reference to the prohibitory legislation on liquors : ' Wherever an overwhelming temperance sentiment exists, wherever, in short, the majority of the people are opposed to the use of liquors, prohibitory legislation succeeds. In all other cases it has proved a failure. In Massachusetts, the people were spending 2*l.* per head on strong drinks in the face of the Maine liquor law. ' We are all for the Maine law,' said a man to Mr. Macrea, ' but we are agin its enforcement.' The law had, in fact, gone further than popular sentiment would bear it out."

The brewers in Philadelphia produce 600,000 barrels of malt liquor annually, giving employment to nearly one thousand men, and consuming in its manufacture a million and a-half bushels of barley of the value of $1.10 per bushel. Ale is a healthy liquor, and lager beer is a favorite beverage, particularly of our large German population.

The question of license or no license is to be submitted to the citizens of Philadelphia, at the general election in October, and if the vote is against license, then the city will be under a prohibitory liquor law during the whole Centennial celebration to which we have invited the whole country. On the 4th July 1776, every patriot drank to the independence of the thirteen states; shall it be that on the 4th July 1876, all we can lawfully offer to our guests on this great anniversary, will be a glass of Schuylkill water, seasoned with a lump of Knickerbocker ice ?

I am a strong believer in temperance. For twenty-five years of my life, I drank nothing but water, but a dangerous illness made a strong stimulant an absolute necessity, and by the advice of my physician, I am obliged occasionally to resort to it. Some of my friends older than myself, have drunk wine all their lives, and are temperate men. I believe in moral suasion as the true means of · advancing the temperance cause, but I do not believe in a prohibitory law which would reduce us to the condition of Boston.

After the dissenting opinion of Chief Justice READ, Judge SHARSWOOD made the following remarks from the bench :—

I concur in the opinion that has just been read, and I do not know that I have anything to add. The result of all the authorities on this subject, which I don't understand to be denied, is, that

[Locke's Appeal.]

it is not competent for the legislature to delegate the law-making power. The point of discussion seems to turn upon what is a law.

It is clear there are a great many things which the legislature can do, and which it is in the habit of doing, and which constitute acts of the legislature, which in the sense of Parker *v.* The Commonwealth, are not laws. There are a good many acts of executive administration which they can delegate to the courts, or to the municipal corporations, or to the people of the different districts. But a "law," properly speaking, is a rule of conduct prescribed by the supreme power of the state, commanding what is right and prohibiting what is wrong.

Now I think no one would doubt, if the legislature were to submit to the people of a county, or township, or ward, the question, whether murder should be punished by imprisonment only, and let the people vote "capital punishment" or "no capital punishment," that would be a law, and the legislature could not delegate it to the people. Does a law, such as the one before us, differ from this? Is it any less a rule of civil conduct than that would be? It seems to me that the question whether there shall be license or no license, is a rule of civil conduct, commanding what is right, and prohibiting what is wrong. It leaves to the people to decide what is right or wrong.

The cases that are cited as overruling Parker *v.* The Commonwealth, are not of the character to which I have referred; they are mere acts of executive administration. It was left to the people to determine by vote where the county seat should be. That could have been left to the county commissioners to determine, or to the courts, or to the people; so the question of subscriptions to railroad stock. It is not a law. So whether part of the surrounding country shall be consolidated into the city; so with the location of public buildings. So the school tax might have been left to the school directors. These are all acts of executive administration, and therefore not laws, in the sense in which the term is used in Parker *v.* The Commonwealth, and in the sense in which it was decided that the legislature has no power to delegate its authority, as I think is done in this case.