East Suburban Press, Inc., a corporation, Appellant *v.* Township of Penn Hills, Appellee.

Argued October 30, 1978, before Judges CRUMLISH, JR., MENCER and CRAIG, sitting as a panel of three.

*Henry G. Beamer,* with him *Metz, Cook, Hanna & Kelly,* for appellant.

*August C. Damian,* with him *Stanley M. Stein,* and *Feldstein, Grinberg, Stein & McKee,* for appellee.

*Edmund S. Ruffin, III, C. James Zeszutek,* and *Thorp, Reed & Armstrong,* for amicus curiae, Pittsburgh Press Company.

OPINION BY JUDGE CRAIG, February 14, 1979:

This declaratory judgment proceeding involves specifications of the Newspaper Advertising Act[1] (Act) which a newspaper must meet in order to carry legal advertising. In addition to a question of interpretation, we also have a question of whether or not an unconstitutional delegation of legislative power is involved in the requirement that a newspaper, to qualify, must be eligible for the second class mailing privileges of the United States Postal Service.

East Suburban Press, Inc. (East Suburban), publisher of a paper called *The Green Tab,* which is primarily distributed free of charge and lacks second class mailing privileges, brought the proceeding when the Township of Penn Hills, a first class township in Allegheny County, following an opinion of its solicitor, refused to permit East Suburban to bid for the township's legal advertising.

The Court of Common Pleas of Allegheny County, correctly determining that an actual controversy existed, permitted Dardanelle Publications, Inc., a local bidder for legal advertising, to intervene as an interested party defendant. The Pittsburgh Press Company, a newspaper publisher, as amicus curiae, and the Pennsylvania Attorney General have filed briefs on the constitutional question.

The Act, in setting forth the qualifications for acceptance of legal advertising,[2] requires that a publica-

---

[1] The current law is 45 Pa. C.S. §101 et seq., which in 1976 replaced the Act of May 16, 1929, P.L. 1784, *formerly* 45 P.S. §1 et seq. Although the 1929 law was originally applicable in this case, the parties have agreed to treat the current 1976 law as being at issue, the provisions in question being virtually identical in both acts.

[2] The definition of "Newspaper" for the purpose of newspaper advertising laws is stated in 45 Pa. C.S. §101(a) as follows:

tion contain news, editorial comment and advertising on four or more pages per issue, be issued at short intervals and have a history of at least six months of publication from an established place of business.

In addition, the section requires that a qualified publication must be (1) distributed for a "definite

---

(1) A printed paper or publication, bearing a title or name, and conveying reading or pictorial intelligence of passing events, local or general happenings, printing regularly or irregularly editorial comment, announcements, miscellaneous reading matter, commercial advertising, classified advertising, legal advertising, and other notices, and which has been issued in numbers of four or more pages at short intervals, either daily, twice or oftener each week, or weekly, continuously during a period of at least six months, or as the successor of such a printed paper or publication issued during an immediate prior period of at least six months, and which has been circulated and distributed from an established place of business to subscribers or readers without regard to number, for a definite price or consideration, either entered or entitled to be entered under the Postal Rules and Regulations as second class matter in the United States mails, and subscribed for by readers at a fixed price for each copy, or at a price fixed per annum. A newspaper may be either a daily newspaper, weekly newspaper, newspaper of general circulation, official newspaper, or a legal newspaper, as defined in this section. Continuous publication within the meaning of this section shall not be deemed interrupted by any involuntary suspension of publication resulting from loss, destruction, failure or unavailability of operating facilities, equipment or personnel from whatever cause, and any newspaper so affected shall not be disqualified to publish official and legal advertising in the event that publication is resumed within one week after it again becomes possible.

(2) A printed paper or publication, regardless of size, contents, or time of issue, or number of copies issued, distributed and circulated gratuitously, is not a newspaper.

(3) A printed paper or publication, not entitled to be entered, or which has been denied entry, as second class matter in the United States mails under the Postal Rules and Regulations of the United States is not a newspaper.

price or consideration'' and subscribed for ''at a fixed price for each copy'' or per annum, not distributed gratuitously, and be (2) 'either entered or entitled to be entered under the Postal Rules and Regulations as second class matter in the United States mails. . . .''

Although East Suburban's petition claimed compliance with the price requirement, it also presented the court below with an alternative claim that the price requirement violates equal protection and due process, as well as raising the validity of the second class mail requirement. The court below, with findings indicating that East Suburban does not comply with either the price or mailing privilege requirements, considered the constitutionality of both those requirements and, holding them to be valid, refused to grant relief.

On appeal to this Court, East Suburban, no longer attacking the validity of the price requirement, claims compliance with it and pursues a constitutional attack only upon the second class mail requirement, with which it admittedly does not comply.

On the first question, whether or not East Suburban's paper is distributed or circulated at a definite or fixed price, the careful findings of fact made by the court below are conclusive that it is, in the main, circulated gratuitously. Summarized, the pertinent findings on this point are:

> East Suburban distributes between 46,000 and 52,000 copies of its weekly paper, *The Green Tab,* in the Penn Hills vicinity. (Finding No. 1)
>
> The paper bears a price of ten cents per copy but all copies are distributed free of charge by carriers, and in bulk to commercial outlets, with the exception of 400 to 1,000 copies per week which are mailed to subscribers who pay $9.00 per year. (Findings Nos. 2, 5)

.

Although the findings reveal *The Green Tab* to be a substantial publication, containing news as well as advertising, on approximately 44 pages per issue, produced by 13 full-time employees including newswriters, the facts are clear that it is overwhelmingly a gratuitously distributed publication. We cannot agree with East Suburban's contention that *The Green Tab* should be treated as a newspaper distributed at a fixed price simply because 2% of its circulation is mailed to paying subscribers.

A plain reading of the Act[3] makes clear that the phrase "without regard to number" refers to the number of subscribers or readers, not to the number of copies distributed for a definite price.

The distinction between publications distributed free of charge and those which are sold is a common and commonly understood one, even though, in the publishing world, a charge may be imposed for mailing copies of a publication normally handed out free or a few copies of a paid publication may be given away. East Suburban's paper falls into the class of free publications.

Moreover, even if we were to assume that East Suburban's paper fails of compliance only with respect to lack of second class mailing privileges, we conclude that no invalid delegation of legislative power is involved in that requirement, which therefore operates to disqualify *The Green Tab* for legal advertising.

A controlling dichotomy was expressed in *Locke's Appeal,* 72 Pa. 491 (1872), in the familiar statement:

> The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of

---

[3] The pertinent passage from 45 Pa. C.S. §101(a) defines as a newspaper that "which has been circulated and distributed from an established place of business to subscribers or readers without regard to number, for a definite price or consideration. . . ."

things upon which the law makes, or intends to make, its own action depend. . . .

72 Pa. at 498.

Thus, when the legislature, facing the impossibility of stating all things definitively in advance, delegates the power to determine the existence or non-existence of a described fact or status, there is no unconstitutional abdication, as more recently exemplified by *Commonwealth v. Tarabilda*, 222 Pa. Superior Ct. 237, 294 A.2d 830 (1972), which defined narcotics as those drugs found by the United States Secretary of the Treasury to be addicting.

*Tarabilda* and particularly *Locke's Appeal, supra,* which involved a local option liquor law, both illustrate the type of legislation which involves *status-finding,* a statutory statement of policy by the legislature to become operative only upon the finding by an administrative agent that a described status exists. A status-finding statute does not involve a delegation of law-making, at least not in the sense of creating general rules governing the subject of the legislature's concern, and therefore the courts have not required detailed standards, but only a description of the status, such as the local vote on liquor option in *Locke's Appeal.*

A second type of statute is the *rule-making* type, where the legislature states a general policy but gives the administrative agent, within limits set by express standards, the power to fill in details of the policy with regulations. This type involves a delegation of rule-making in the sense of creating generalized rules of continuing application on the subject of the legislature's concern. Hence, judicial doctrine has required clear standards.[4]

---

[4] The dichotomy of status-finding and rule-making delegations is different from the further pairing which our Supreme Court has

A rule-making delegation was upheld in *Fisher's Petition,* 344 Pa. 96, 23 A.2d 878 (1942) in which a delegated power to promulgate minimum wage levels and regulations was circumscribed by explicit standards considered to be "ample" by the Supreme Court.

The result was different in *Holgate Brothers Co. v. Bashore,* 331 Pa. 255, 200 A. 672 (1938), involving a delegation of regulation-making without limiting standards.

Approaching the language of the Newspaper Advertising Act head-on, we must acknowledge fairly that the reference here, at first appearance, seems to leave the second class mail qualification to whatever rules and regulations the United States Postal Service might make from time to time, without any standard other than that supplied by reference to the second class mailing privilege itself. In other words, it seemingly has the structure of a rule-making statute, without a standard to control the rule-making.

However, the key point here is that the Pennsylvania General Assembly, in setting about to define publications eligible to carry legal advertising, did not delegate the formulation of rules on the subject of *legal advertising* to any external agency. The federal concern here is not with that subject at all but with the entirely different matter of *postal operations,* a subject which the United States Constitution reposes exclusively in the federal government and its creatures. United States Constitution, Art. I, §8, cl. 7;

---

described with respect to the statutory embodiment or basis for rule making, distinguishing between legislative rule-making power (based upon an express authorization to make regulations) and interpretative rule-making power (implied by the authorization of an agency generally to administer a law). *See Uniontown Area School District v. Pennsylvania Human Relations Commission,* 455 Pa. 52, 76-77, 313 A.2d 156, 169 (1973).

*Ex Parte Jackson,* 96 U.S.. 727, 732 (1878) ; *Ex Parte Rapier,* 143 U.S. 110 (1892).

Thus the present situation is different from that in *Holgate Brothers, supra,* where the legislature, proposing to regulate *working hours,* turned over the power to make rules on *working hours* to the administrative agencies, without limiting standards.

Here the legislature, in looking to the relevant but distinct role of another agency in its exclusive *postal* sphere, is not abdicating its control of the *legal advertising* sphere.

A reference of similar nature, to the constitutionally exclusive federal jurisdiction over a different subject, was present also in *Commonwealth v. Alderman,* 275 Pa. 483, 119 A. 551 (1923) in which the Act of May 5, 1921, P.L. 407, §1, was held to be valid in defining "intoxicating liquors" to be those found to be intoxicating by Act of Congress "from time to time." 275 Pa. at 486, 119 A. at 552. Thus, with the Eighteenth Amendment giving the Congress special control over liquor traffic, no unlawful delegation was involved in such a reference for the state's purpose of making intrastate possession of liquor a misdemeanor.

Another similar example is the validity of defining "net income" for Pennsylvania *excise tax* purposes by reference to federal determinations for *income tax* purposes. *Commonwealth v. Warner Bros. Theatres, Inc.,* 345 Pa. 270, 273, 27 A.2d 62, 64 (1942).

Thus, as the United States Postal Service[5] sets about, in pursuance of the lawful functions of the post, to classify mailing privileges,[6] there need be no

---

[5] The United States Postal Service is an "independent establishment" of the executive branch of the United States Government. 39 U.S.C. §201.

[6] The Postal Rate Commission of the United States Postal Service, under 39 U.S.C. §3623(a), is empowered to establish mail

fear that it will usurp the state legislature's purposes with respect to legal advertising, particularly when, as Judge FINKELHOR soundly pointed out below, a rational concern for legal advertising is that its circulation be facilitated by the independent action of the federal establishment.

Because the state legislature, for the dissemination of legal advertising, has an obviously legitimate concern about circulation through the mails, the exclusive jurisdiction of the federal agency over the post leaves no alternative but to defer to the way in which the postal system chooses to operate.[7] As in the *Alderman* case, *supra*, we simply have "acceptance by our legislature of the inevitable."

In summary, our precedents indicate that, even though a state statute making reference to a federal determination involves more than status-finding, it nevertheless is not a rule-making delegation requiring specific guiding standards when (1) the federal determination has a rational relationship to the state law's subject and purpose, and (2) the federal determination deals with a different subject and purpose specially or exclusively within the federal sphere.

Accordingly, we affirm the decision of the court below, holding that it is not an unconstitutional delegation of legislative power to require that newspapers

---

classifications, in accordance with fully-stated standards in 39 U.S.C. §3623(c).

[7] The necessity of the situation is illustrated by Section 1 of the Uniform Single Publication Act, Act of August 21, 1953, P.L. 1242, 12 P.S. §2090.1, which provides that only one tort cause of action may arise from any one "broadcast over radio or television." The state must acknowledge the supremacy of the federal government over the very existence of a radio or television broadcast. Hence the state must defer, to that extent, to the federal law, as it exists from time to time, when the state law of tort interrelates with the federal sphere.

have second class mailing privileges in order to publish official legal advertising.

ORDER

AND Now, this 14th day of February, 1979, the order of the Court of Common Pleas of Allegheny County, dated July 20, 1977, is affirmed.