Edward MULROY, d/b/a Mulroy Dairy Farms, Plaintiff,

v.

John R. BLOCK, Secretary of Agriculture of the United States of America, Defendant.

No. 82–CV–1191.

United States District Court, N.D. New York.

May 5, 1983.

Carroll, Carroll & Butz, Syracuse, N.Y., for plaintiff; John Benjamin Carroll, Syracuse, N.Y., of counsel.

J. Paul McGrath, Asst. Atty. Gen., Dept. of Justice, Civil Division, Washington, D.C., Frederick J. Scullin, Jr., U.S. Atty., Northern Dist. of N.Y., Syracuse, N.Y., for defendant; Stephen E. Hart, Catherine H. Coleman, Washington, D.C., Nancy Jones, Asst. U.S. Atty., Syracuse, N.Y., of counsel.

## MEMORANDUM–DECISION

MUNSON, Chief Judge.

On October 29, 1982, the plaintiff, Edward Mulroy, commenced this action seeking to temporarily, preliminarily and permanently enjoin the defendant, John R. Block, from collecting funds pursuant to the Omnibus Budget Reconciliation Act of 1982, Pub.L. No. 97–253, Section 101, 96 Stat. 763 (Sept. 8, 1982 (amending the Agricultural Act of 1949, as amended by the Agriculture and Food Act of 1981, 7 U.S.C. Section 1446)). Presently before the Court are cross motions for summary judgment.

## FACTS

Edward Mulroy is a dairy farmer in Marcellus, New York. He owns a farm, 100 cows, a processing plant and delivery trucks. With these, he produces and sells milk directly to consumers within an eight mile radius of the plant. The class of persons who do business in a manner similar to that of the plaintiff is known as producer-handler of milk. Approximately one percent of the milk in the United States is produced in a similar manner. Mulroy does not sell milk at the wholesale level nor does he sell or purchase milk or milk products from any other dealer, cooperative or the Commodity Credit Corporation.

John Block is responsible for administering the federal milk price support program and the federal milk marketing order system. The federal milk price support program is carried out through the Commodity Credit Corporation (CCC), a governmental corporate entity within the United States Department of Agriculture.

In order to ensure American consumers of adequate milk supplies, the CCC has a standing offer to purchase unlimited quantities of milk products at prices set by Congress. 7 U.S.C.A. § 1446(c) (Supp.1982). Since the mid-1970's, the minimum level price support mandated by Congress has increased. Consequently, producers have been encouraged to expand milk production, even in excess of commercial market demand. In the past two marketing years, the CCC has purchased approximately 10% of all milk produced in the United States. In fiscal year 1982, the CCC spent about 2.3 billion dollars to purchase dairy products under the price support program. As of November 12, 1982, the CCC had uncommitted inventories of approximately 407 million pounds of butter, 792 million pounds of cheese and 1.2 billion pounds of nonfat dry milk. The annual storage costs are approximately 50 million dollars. Affidavit of Everett G. Rank, Executive Vice President CCC, at ¶ 6, December 10, 1982.

In an attempt to restore a balance between milk production and commercial demand for dairy products, to reduce the waste of resources committed to producing surplus dairy products and to reduce the huge expenditures of taxpayers' money to purchase surplus products, Congress has enacted certain amendments to the milk price support system as part of the Omnibus Budget Reconciliation Act of 1982. 7 U.S.C.A. § 1446(d)(2) & (3) (Supp.1982).

The dairy provisions of that Act provide: Effective for the period beginning October 1, 1982, and ending September 30, 1985, the Secretary may provide for a deduction of 50 cents per hundredweight from the proceeds of sale of all milk marketed commercially by producers to be remitted to the Commodity Credit Corporation to offset a portion of the cost of the milk price support program. Authority for requiring such deductions shall not apply for any fiscal year for which the Secretary estimates that net price support purchases of milk or the products of milk would be less than 5 billion pounds milk equivalent. If at any time during a fiscal year the Secretary should estimate that such net price support purchases during that fiscal year would be less than 5 billion pounds, the

authority for requiring such deduction shall not apply for the balance of the year.

7 U.S.C.A. § 1446(d)(2) (Supp.1982).

In addition, the statute provides:

Effective for the period beginning April 1, 1983 and ending September 30, 1985, the Secretary may provide for a deduction of 50 cents per hundredweight, in addition to the deduction referred to in paragraph (2), from the proceeds of sale of all milk marketed commercially by producers to be remitted to the Corporation. The deduction authorized by this subparagraph shall be implemented only if the Secretary establishes a program whereby the funds resulting from such deductions would be refunded in the manner provided in this paragraph to producers who reduce their commercial marketings from such marketings during the base period .... The Secretary may make such adjustments in individual bases under this subparagraph as the Secretary determines necessary to correct for abnormal factors affecting production and to reflect such other factors as the Secretary determines should be considered in determining a fair and equitable base.

7 U.S.C.A. § 1446(d)(3)(A) (Supp.1982).

Section 1446(d)(3)(B) of Title 7 provides for the refund of the second fifty cents upon certain conditions:

Refunds under this paragraph shall be based on reductions in commercial marketings as specified by the Secretary, but the Secretary may not require as a condition for making a refund of the entire amount collected from a producer that the producer reduce marketings in excess of a reduction equivalent to the ratio that the total amount of surplus milk production, as estimated by the Secretary for the fiscal year, bears to the total milk production estimated for such period. The Secretary may provide for refunds to be made of amounts collected from producers on a pro rata basis taking into consideration the reduction in commercial marketings by the producer from the commercial marketings during the base period.

*Id.*

On September 22, 1982, the Secretary projected that for the fiscal year beginning October 1, 1982, the net price support purchases of milk would be 12.6 billion pounds and consequently, determined to impose the initial 50 cent assessment effective December 1, 1982. This decision to assess was published as a "notice of determination" on September 24, 1982, in 47 Federal Register at 42128.

Also on that date, the Secretary noticed and invited comment on a related "proposed rule." 47 Fed.Reg. 42112 (Sept. 24, 1982). The "proposed rule" dealt exclusively with the procedure by which the Secretary would collect the already determined assessment. In other words, the proposed rule assumed the assessment and invited comment merely as to the procedure by which the assessment would be collected. 47 Fed.Reg. 42112 (Sept. 24, 1982).

On November 30, 1982, the "final rule" setting forth the administrative procedures that would be used to implement the deduction was published. 47 Fed.Reg. 53831 (Nov. 30, 1982). In accordance with this mandate, the first deductions were to be made in December, 1982. On December 21, 1982, however, the Hon. Matthew J. Perry, United States District Judge for the District of South Carolina entered an order temporarily restraining the defendant from collecting the assessment. Thereafter, on January 10, 1983, Judge Perry preliminarily enjoined the defendant from doing the same. The basis of the injunction was a determination by Judge Perry that the regulation imposing the assessment was violative of the Administrative Procedure Act.

Following the entry of Judge Perry's order, the Secretary published a new "notice of proposed determination" inviting public comment regarding the assessment. 48 Fed.Reg. 3764 (Jan. 27, 1983). On March 17, 1983, the Secretary published a final "notice of determination" concluding that the 50 cent per hundredweight assessment

would be collected beginning April 16, 1983. 48 Fed.Reg. 11253 (March 17, 1983).

## DISCUSSION

Mulroy now challenges the statute and regulation on both procedural and substantive grounds. Specifically, he alleges:

1) The dairy provisions of the Act unconstitutionally delegate taxing power to the Secretary of Agriculture;

2) The dairy provisions of the Act do not set forth sufficient standards to guide the Secretary in making a determination of whether or not to impose either deduction or refund;

3) The dairy provisions of the Act unlawfully delegate power to non-federal employees at 7 U.S.C.A. § 1446(d)(7);

4) The dairy provisions of the Act are an unconstitutional attempt to regulate intrastate commerce;

5) The dairy provisions of the Act, if an exercise of the commerce power, are invalid in that they are irrational, discriminatory, and there was no showing of need and no public hearing;

6) The dairy provisions of the Act, as a revenue raising measure, are invalid because they did not originate in the House of Representatives as required by Article 1, Section 7, clause 1 of the United States Constitution;

7) The dairy provisions of the Act are invalid because they are not passed in compliance with the rules of the House and Senate which forbid the insertion of new matter in conference bills and because they were not referred to the Budget Committees as required by 31 U.S.C. § 1327; and

8) The Secretary's determination to assess is not in compliance with the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq.

For the reasons which follow, this Court is constrained to conclude that the statute authorizing the deduction is constitutionally valid and the regulation is in compliance with the National Environmental Policy Act (NEPA).

## THE DELEGATION CLAIM

The plaintiff's claim that the Act is an unconstitutional delegation is three-fold. First, Mulroy alleges that the Act unconstitutionally delegates the taxing power to the Secretary of Agriculture. Second, the plaintiff claims that the Act, if an exercise of the commerce power, is invalid for lack of sufficient standards to guide the Secretary in making a determination whether or not to impose either deduction or refund. Finally, Mulroy alleges that the Act unlawfully delegates power to non-federal employees.

■ With regard to the plaintiff's first allegation, that the Act is an unconstitutional delegation of the taxing authority, this Court finds that the Act, rather than being a taxing measure, is a proper exercise of the power of Congress to regulate commerce. In making such a determination,

> [t]he test to be applied is to view the objects and purposes of the statute as a whole and if from such examination it is concluded that revenue is the primary purpose and regulation merely incidental, the imposition is a tax and is controlled by the taxing provisions of the Constitution. Conversely, if regulation is the primary purpose of the statute, the mere fact that incidentally revenue is also obtained does not make the imposition a tax, but a sanction imposed for the purpose of making effective the congressional enactment.

*Rodgers v. United States,* 138 F.2d 992, 994 (6th Cir.1943). The court went on to state:

> The power of Congress to 'regulate commerce' is the power to prescribe the rules by which commerce is to be governed and the Congress is at liberty to adopt any method which it deems effective to accomplish that permitted end.

*Id.* That "revenue may incidentally arise therefrom does not divest the regulation of its commerce character and render it an exercise of the taxing power." *Id.* at 994.

The Act with which this Court is here concerned has for its primary object the regulation of milk production. The means chosen by Congress to that end is the impo-

sition of an assessment. The imposition of penalties and assessments have long been a permissible means of regulating commerce. *See, e.g., Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942).

The dairy provisions at issue here were enacted in an attempt to restore a balance between milk production and commercial demand for dairy products. Although the assessment will reduce the huge expenditures of taxpayers' money used to purchase the surplus dairy products, reduction of production, and not the raising of revenue is the primary goal of the assessment. This is made clear by the fact that the assessment is tied to the Secretary's estimate of the annual net price support purchases.[1] Accordingly, the dairy amendments must be characterized as an exercise of the commerce power and not an unconstitutional exercise of the taxing power.

■ Mulroy's second delegation claim is that the dairy amendments are invalid because there are no statutory standards to guide the Secretary of Agriculture in determining the initial 50 cent per hundredweight assessment, the second assessment or the refund. The legislation, Mulroy maintains, gives the Secretary unfettered discretion to determine when to assess and when to refund. Moreover, Mulroy asserts that any seeming limitations on the Secretary's power are withdrawals of power, not standards to guide the Secretary in exercising his authority. As such, the plaintiff maintains, they fail to legitimize the Secretary's authority.

In 1690, John Locke wrote:

The legislature cannot transfer the power of making laws to any other hands for it being but a delegated power from the people, they who have it cannot pass it over to others.

J. Locke, *Second Treatise of Civil Government, in the Tradition of Freedom,* ¶ 141 (M. Mayer ed. 1957). Two hundred years later, the Supreme Court, in *Field v. Clark,* 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892), expressly recognized this limitation. "That Congress cannot delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution." *Id.* at 692, 12 S.Ct. at 504. Nevertheless, the Supreme Court has also recognized that the "hermetic sealing-off of the three branches of government from one another could easily frustrate the establishment of a National Government . . . ." *Industrial Union Dept. v. American Petroleum Institute,* 448 U.S. 607, 673, 100 S.Ct. 2844, 2880, 65 L.Ed.2d 1010 (1980) (J. Rehnquist, concurring). *See also, J.W. Hampton, Jr., & Co. v. United States,* 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (1928). In reconciling these competing principles, the Supreme Court has only twice struck down legislation as an excessive delegation of legislative authority to the Executive. *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935); *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935).

In *Panama Refining Co.,* the Supreme Court struck down legislation which authorized the President to:

prohibit the transportation in interstate and foreign commerce of petroleum and the products thereof produced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by any state law or valid regulation or order prescribed thereunder, by any board, commission, officer, or other duly authorized agency of a state. Any violation of any order of the President issued under the provisions

---

1. The Secretary may not impose the 50 cent per hundredweight assessment in any year in which he estimates that net price support purchases will be less than 5 billion pounds. 7 U.S.C.A. § 1446(d)(2) (Supp.1982). Likewise, the Secretary may not impose the second 50 cent per hundredweight assessment in any year in which he estimates that net price support

purchases will be less than 7.5 billion pounds. 7 U.S.C.A. § 1446(d)(3)(A) (Supp.1982). Moreover, if the second 50 cent assessment is to be imposed, the Secretary must provide a program for refunds to those producers who reduce their commercial marketings. 7 U.S.C.A. § 1446(d)(3)(A) (Supp.1982).

of this subsection shall be punishable by fine of not to exceed $1,000.

*Panama Refining Co. v. Ryan,* 293 U.S. 388, 406, 55 S.Ct. 241, 242, 79 L.Ed. 446 (1935) *quoting* the National Industrial Recovery Act of June 16, 1933.

Concluding that the statute did not lay down rules for the guidance of state legislatures, that it did not qualify the President's authority by reference to the basis or extent of the state's limitations on production, that it did not state whether, or in what circumstances or under what conditions, the President is to prohibit the transportation of the petroleum, that it established no criteria to govern the President's course and that it did not require any finding by the President as a condition of his action, the Court struck down the legislation. *Id.* at 415, 55 S.Ct. at 246.

Likewise, in *Schechter Poultry,* the Court struck down a statute whose purpose was "to rehabilitate industry and to conserve natural resources," finding that the legislation prescribed no method of attaining that end save by establishing codes of fair competition, the nature of whose provisions were not defined. In addition the Court relied on the fact that the legislation provided no standards to which the codes were to conform and that the function of formulating the codes was delegated to private individuals engaged in the industries to be regulated. 295 U.S. at 541–42, 55 S.Ct. at 848.

Since the *Schechter* decision, no federal court has held a statute unconstitutional based on excessive delegation. Indeed, several courts have intimated that the delegation doctrine is dead. *See, e.g., FPC v. New England Power Co.,* 415 U.S. 345, 353, 94 S.Ct. 1151, 1156, 39 L.Ed.2d 383 (1974) (J. Marshall, concurring) ("the notion that the Constitution narrowly confines the power of Congress to delegate authority to administrative agencies, which was briefly in vogue in the 1930's, has been virtually abandoned by the Court for all practical purposes"); *National Association of Property Owners v. United States,* 499 F.Supp. 1223, 1239 (D.Minn.1980) (the delegation

doctrine was "laid to rest"). While not ascribing to the belief that the delegation doctrine is dead, this Court nevertheless does not find that the legislation here at issue is invalid on grounds of improper delegation.

In *American Power & Light Company v. Securities & Exchange Commission,* 329 U.S. 90, 67 S.Ct. 133, 91 L.Ed. 103 (1946), the Supreme Court announced that for delegation purposes it is "constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Id.* at 105, 67 S.Ct. at 142.

Applying this holding to the Agricultural Act of 1949, as amended, this Court concludes that the delegation here is proper. Here Congress announced the policy behind the legislation: to restore a balance between milk production and commercial demand for dairy products; Congress declared who would administer the program—the Secretary of Agriculture; and Congress specified the maximum amount of the assessment—$1.00 per hundredweight. Moreover, Congress specified when the assessment could be levied—in the case of the first 50 cent assessment, when the Secretary estimates that net price support purchases of milk or milk products would be at least 5 billion pounds milk equivalent, in the case of the second 50 cent assessment, when the Secretary estimates the same at 7.5 billion pounds milk equivalent; and Congress stated the effective period for the assessment—for the first 50 cent assessment, between October 1, 1982 and September 30, 1985, and for the second 50 cent assessment, between April 1, 1983 and September 30, 1985. 7 U.S.C.A. § 1446(d) (Supp.1982). In addition, Congress declared with specificity the conditions and manner under which the Secretary would be required to refund the second 50 cent assessment. *Id.*

While the authority given to the Secretary is broad, it is not without limitation and by no means does it run afoul of the Constitution.

■ The plaintiff's third delegation claim is a bald assertion that Title 7 United States Code, Section 1446(d)(7) (Supp.1982), which authorizes the Secretary of Agriculture to use state and county agriculture officials to help carry out the assessment is an unlawful delegation of power to non-federal employees. This Court simply concludes that because the statute merely authorizes the Secretary to seek the assistance of non-federal employees in "carrying out" the program, and not in any policy-making capacity, the contested provision does not exceed lawful bounds.

COMMERCE CLAIMS

■ Fourth, the plaintiff maintains that the dairy amendments are an unconstitutional attempt by Congress to regulate *intra* state commerce. In this regard the plaintiff relies on the fact that all the milk he produces is sold directly to consumers within an 8 mile radius of his farm, and all within Onondaga County and the State of New York.

Article 1, Section 8, clause 3 of the United States Constitution provides that Congress shall have the power "[t]o regulate commerce with foreign Nations and among the several States, and the Indian Tribes." It is well settled that pursuant to this provision Congress may regulate wholly intrastate activity that has an effect on interstate commerce. *Hodel v. Virginia Surface Mining & Reclamation Association,* 452 U.S. 264, 277, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981); *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942); *United States v. Wrightwood Dairy Co.,* 315 U.S. 110, 62 S.Ct. 523, 86 L.Ed. 726 (1942). In *Wickard,* the plaintiff sought to enjoin enforcement of a wheat marketing penalty imposed by the Agricultural Adjustment Act of 1938, as amended. The Court denied the injunction and held that the marketing quota could be applied to a farmer who grew a small amount of wheat primarily for his own use. Finding that "[h]ome-grown wheat in this sense competes with wheat in commerce," the court held that although the farmer's "own contribution to the demand for wheat

may be trivial by itself, [it] is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial." *Id.* at 127–28, 63 S.Ct. at 90.

By the same token, it must be said that the milk Mulroy sells competes with milk produced elsewhere, milk that might otherwise be sold to Mulroy's customers. When, as here, Congress has determined that the activity of the plaintiff's class imposes burdens upon the flow of milk interstate, Congress may regulate that activity. *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). For this reason, the challenged legislation is a proper exercise of the commerce power.

Fifth, the plaintiff maintains that the dairy amendments, if an exercise of the commerce power, are invalid in that there was no showing of need and no public hearing, and that the amendments are irrational and discriminatory.

■ At the outset, this Court notes that formal findings of need are not necessary to the valid exercise of the commerce power. *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964). Moreover, having previously determined that the activity being regulated affects interstate commerce, "the only remaining question for judicial inquiry is whether 'the means chosen by Congress [are] reasonably adapted to the end permitted by the Constitution.'" *Hodel v. Virginia Surface Mining & Reclamation Assn.,* 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981) *citing Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 258, 85 S.Ct. 348, 358, 13 L.Ed.2d 258 (1964); *United States v. Darby,* 312 U.S. 100, 121, 61 S.Ct. 451, 460, 85 L.Ed. 609 (1941); *Katzenbach v. McClung,* 379 U.S. 294, 304, 85 S.Ct. 377, 383, 13 L.Ed.2d 290 (1964). "A court may invalidate legislation enacted under the Commerce Clause only if it is clear that there is no rational basis ... between the regulatory means selected and the asserted ends." *Hodel v. Indiana,* 452

U.S. 314, 323–24, 101 S.Ct. 2376, 2383, 69 L.Ed.2d 40 (1981).

■ While this Court is of the opinion that the dairy provisions are unwise and may unnecessarily bring about the demise of many small scale farmers, it cannot be said that the legislative scheme is not rationally related to Congress' purpose of reducing the overproduction of milk and milk products. In that the legislation in question ties the assessment to the level of net price support purchases and requires refunds to issue to those producers who reduce their marketings in conformity with a designated schedule, this Court believes that the legislation is rational.

Moreover, it cannot be said that the Act discriminatorily taxes Mulroy, like other dairy farmers in Central New York, to support those farmers who are guilty of overproduction. Congress has determined that the deduction should apply to *all* milk marketed commercially by producers. Because the price support level established by Congress undergirds the price Edward Mulroy can command for his milk, and because Mulroy has an indirect effect on the overproduction,[2] this Court feels constrained to conclude that the dairy amendments are not irrational or arbitrary and do not discriminatorily tax the plaintiff.

PROCEDURAL CLAIMS

■ The plaintiff's sixth claim is that the Act, as revenue raising legislation, is invalid because it did not originate in the House of Representatives. In this regard, the plaintiff cites Article 1, Section 7, clause 1 of the United States Constitution which provides:

All bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills.

While it is true that revenue raising legislation must originate in the House of Representatives, it has long been recognized that this limitation is "confined to bills [which] levy taxes in the strict sense of the words, and has not been understood to extend to bills for other purposes which incidentally

create revenue." *United States v. Norton,* 91 U.S. 566, 569, 23 L.Ed. 454 (1875) *quoting* J. Story on the Constitution § 880. Thus, Article 1, Section 7, Clause 1 does not invalidate those revenue raising "impositions made incidentally under the commerce clause . . . , as a means of constraining and regulating." *United States v. Stangland,* 242 F.2d 843, 848 (7th Cir.1957).

As previously discussed, the imposition with which this Court is here concerned has for its primary purpose the regulation of milk production. Moreover, whatever assessments are imposed are but means to the purpose provided by the Act. *Millard v. Roberts,* 202 U.S. 429, 437, 26 S.Ct. 674, 675, 50 L.Ed. 1090 (1906). As such, the assessment provisions are not revenue raising measures within the meaning of Article 1, Section 7, clause 1 of the United States Constitution.

■ At the same time, and regardless of the primary purpose of the dairy amendments, this Court must reject the plaintiff's allegation that the bill imposing the assessment did not originate in the House of Representatives. Although that portion of the Omnibus Budget Reconciliation Act which imposes the assessment was *not provided* as part of the original House bill, but rather appeared by way of an amendment, in that the amendment was germane to the subject matter of the bill, *Flint v. Stone Tracy Co.,* 220 U.S. 107, 143, 31 S.Ct. 342, 346, 55 L.Ed. 389 (1911), the legislation at issue comports with Article 1, Section 7, clause 1 of the Constitution in all respects. In making this determination, however, this Court does not wish to be regarded as holding that

the journals of the House and Senate may be examined to invalidate an act which has been passed and signed by the presiding officers of the House and Senate and approved by the President and duly deposited with the State Department.

220 U.S. at 143, 31 S.Ct. 346.

■ By the same token, this Court must reject the plaintiff's seventh claim that the

---

**2.** For every gallon of milk the plaintiff sells locally, some other producer loses a sale. The

government, then, must purchase the surplus milk.

dairy provisions of the Act are invalid because they were not passed in compliance with the rules of the House and Senate which forbid the insertion of new matter into conference bills. It has long been the rule that

> [t]he signing by the Speaker of the House of Representatives and by the President of the Senate, in open session, of an enrolled bill, is an official attestation by the two houses of such bill as one that has passed Congress. It is a declaration by the two houses, through their presiding officers, to the President, that the bill, thus attested, has received, in due form, the sanction of the legislative branch of the government, that it is delivered to him in obedience to the constitutional requirement that all bills which pass Congress shall be presented to him. And when a bill, thus attested, receives his approval and is deposited in the public archives, its authentication as a bill that has passed Congress should be deemed complete and unimpeachable .... The respect due to co-equal and independent departments requires the judicial department to act upon that assurance and to accept, as having passed Congress, all bills authenticated in the manner stated, leaving the courts to determine, when the question properly arises, whether the act, so authenticated, is in conformity with the Constitution.

*Twin City Bank v. Nebeker,* 167 U.S. 196, 201, 17 S.Ct. 766, 768, 42 L.Ed. 134 (1897).

■ In a related argument, the plaintiff maintains that the dairy provisions of the Act are invalid because they were not referred to the Budget Committee of each House as required by Title 31 United States Code, Section 1327 (now codified at Title 2 United States Code, Section 637). That statute provides:

> No bill or resolution, and no amendment to any bill or resolution dealing with any matter which is within the jurisdiction of the Committee on the Budget of either House shall be considered in that House unless it is a bill or resolution which has been reported by the Committee on the Budget of that House (or from the consideration of which such committee has been discharged) or unless it is an amendment to such a bill or resolution.

Assuming *arguendo* that the enrolled rules doctrine does not prevent this Court from determining Congress' compliance with Title 2 United States Code, Section 637, it is clear that Congress complied with that provision in all respects. Congressman Jones of Oklahoma, the Chairman of the House Budget Committee requested a waiver of the requirements of Title 2 United States Code, Section 637. To his request, there was no objection. *See* H.R. 6955, 128 Cong.Rec. H5539 (Aug. 10, 1982). Likewise, those requirements were waived by unanimous consent in the Senate. H.R. 6955, 128 Cong.Rec. S10222 (Aug. 11, 1982). Accordingly, this portion of the plaintiff's claim must also be rejected.

## NATIONAL ENVIRONMENTAL POLICY ACT CLAIM

Finally, the plaintiff maintains that the Secretary of Agriculture's action is improper because he failed to file a statement pursuant to the National Environmental Policy Act (NEPA), Title 42 United States Code, Section 4321 *et seq.* NEPA requires that in the case of "major Federal actions significantly affecting the quality of the human environment" federal agencies must prepare "a detailed statement by the responsible official on—(i) the environmental impact of the proposed action." Title 42 United States Code, Section 4332(2)(C)(i).

■ Recently, the Supreme Court stated:

> The theme of § 102 is sounded by the adjective 'environmental'. NEPA does not require the agency to assess *every* impact or effect of its proposed action, but only the impact or effect on the environment .... [W]e think the context of the statute shows that Congress was talking about the physical environment—the world around us, so to speak.

*Metropolitan Edison Co. v. People Against Nuclear Energy,* —— U.S. ——, ——, 103 S.Ct. 1556, 1560, 75 L.Ed.2d 534 (1983). A court must look at the relationship between

a particular effect and the change in the physical environment caused by the major federal action at issue in order to determine whether NEPA requires consideration of that effect. *Id.* NEPA, the Court stated, "include[s] a requirement of a reasonably close causal relationship between a change in the physical environment and the effect at issue." *Id.*

In the Second Circuit, determination of such an effect is left to the relevant agency. In *Cross-Sound Ferry Services, Inc. v. United States,* 573 F.2d 725 (2d Cir.1978), the Second Circuit stated,

> [a]n EIS is required only in the case of major federal actions significantly affecting the quality of the human environment. The identification of such action is the responsibility of the relevant federal agency to be carried out against the background of its own particular operations.

*Id.* at 731. In furtherance of this policy, the Second Circuit has held that "an agency's determination that an impact statement is not required will be overturned by a reviewing court only if it is arbitrary, capricious, or an abuse of discretion." *Id.* at 731–32. *Compare, Foundation for North American Wild Sheep v. United States Department of Agriculture,* 681 F.2d 1172, 1177 (9th Cir.1982); *Highland Cooperative v. City of Lansing,* 492 F.Supp. 1372, 1377 (W.D.Mich.1980) (agency's action will be overturned if unreasonable).

▮ Whereas purely economic issues by themselves are not within the zone of interest to be protected by this law, where economic interests are interrelated with environmental effects, all effects on human environment should be considered in an environmental impact statement. *Highland Cooperative,* 492 F.Supp. at 1372.

▮ In the instant case, the Secretary of Agriculture gave public notice of the proposed federal action. 48 Fed.Reg. 3764 (January 27, 1983) and an opportunity for interested parties to submit relevant data. After reviewing the comments and completing an environmental evaluation of the effect of the assessment, the Secretary of Agriculture concluded that an Environmental Impact Statement was unnecessary because the assessment "is not expected to have any significant impact on the quality of the human environment." 48 Fed.Reg. 11253 (March 17, 1983). In view of the fact that the assessment is only to be levied for the period between April 16, 1983 and September 30, 1985, and that any effect of the assessment on the human environment would be indirect at best, and that the plaintiff has not alleged specific facts which, if true, would demonstrate that the proposed project may significantly degrade some human environmental factors, *Foundation for North American Wild Sheep,* 681 F.2d at 1178, this Court concludes that the Secretary's decision that an EIS was not required was neither "arbitrary, capricious or an abuse of discretion." Accordingly, the plaintiff's claim in this respect must fail.

## CONCLUSION

For the foregoing reasons, this Court is compelled to uphold the dairy amendments of the Omnibus Budget and Control Act and the Secretary's regulations imposing the assessment insofar as it complies with NEPA.[3] This is so notwithstanding this Court's judgment and the judgment of many others that the statute is bad law and the assessment unwise.

It seems incongruous that Congress, in an effort to provide dairy farmers of this nation with a minimum level of support, which after all, is in part what the price support program is all about, 7 U.S.C.A. § 1446b (1973), has chosen a measure which will inevitably bring about the demise of many of these same dairy farmers. Indeed, in a time when this nation is experiencing the decline and threatened extinction of the individual farmer, it is particularly disturbing to see legislation such as this which will

---

**3.** At this time, this Court makes no determination as to the regulation's conformity with the Administrative Procedure Act.

undoubtedly have a devastating effect on the small scale dairy farmers of this nation.

At a time like this, it is unfortunate that the judgment of this Court cannot be substituted for the judgment of the legislative branch of our government, *Flint v. Stone Tracy Co.*, 220 U.S. 107, 173–74, 31 S.Ct. 342, 357–58, 55 L.Ed. 389 (1911), when, as here, it is apparent that the judgment of the legislative branch was unwise. Sadly, I may not be swayed by my own view of the inequities which may occur as a result of this governmental action. *Wickard v. Filburn*, 317 U.S. 111, 129, 63 S.Ct. 82, 91, 87 L.Ed. 122 (1942); *Flint v. Stone Tracy Co.*, 220 U.S. 107, 169, 31 S.Ct. 342, 356, 55 L.Ed. 389 (1911). Rather, I must reside in the hope that Congress in its wisdom will shortly determine to rectify the inequities which inevitably will result from the imposition of this assessment.

There being no material issue of fact, and defendant being entitled to a judgment as a matter of law, defendant's motion for summary judgment is granted and plaintiff's motion for summary judgment is denied.