473 A.2d 933

METROPOLITAN LIFE INSURANCE COMPANY

v.

INSURANCE COMMISSIONER OF the STATE
OF MARYLAND.

No. 881, Sept. Term, 1983.

Court of Special Appeals of Maryland.

April 11, 1984.

Robert R. Baldwin, Asst. Gen. Counsel, with whom were Alan N. Gamse and Semmes, Bowen & Semmes, Baltimore, on brief, for appellant.

Kathleen M. Sweeney, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen., and Lynn Goldman Mathias, Asst. Atty. Gen., on brief, for appellee.

Argued before GILBERT, C.J., and WILNER and GARRITY, JJ.

WILNER, Judge.

We have before us a dispute between Metropolitan Life Insurance Company, a New York corporation (Metropolitan), and the State Insurance Commissioner over the amount of premium tax due by Metropolitan for 1971. The dispute arises from a difference of opinion concerning the application of Maryland's "retaliatory" premium tax (Md.Code Ann. art. 48A, § 61(1)). Metropolitan contends that one part of the tax statute—the last sentence of § 61(1)—is unconstitutional because of vagueness and because it improperly delegates legislative authority to the Commissioner.

The Maryland Tax Court found no merit in Metropolitan's argument; the Circuit Court for Baltimore City found no merit in it; and we find no merit in it. We do not necessarily concur with the method used by the Commissioner to calculate the tax, but as Metropolitan has not complained about the use of that particular method, we shall not further consider that question.

Insurance companies are taxed in a different manner than other business corporations. Since New York began the trend in 1824, the principal (and in most cases the only) State tax on insurance companies is a premium tax—a tax fixed at a set percentage of gross direct premiums attributable to business done in the State. All fifty States impose

such a tax. The Maryland tax is found in Md.Code Ann. art. 81, §§ 136–143A.

█ At least forty-nine States, Hawaii being the possible exception, also have what has become known as a "retaliatory" tax. This, too, is of somewhat ancient lineage, dating back to a Massachusetts enactment in 1832. The purpose of this tax is less the raising of revenue than the encouragement of a parity among the primary State premium taxes, to assure that insurance companies chartered in the home (*i.e.,* retaliating) State are not subjected to a greater tax burden in other States than the insurance companies chartered in those other States are subjected to in the home State. As the Court of Appeals put it, in terms of the Maryland retaliatory tax, "[t]he design was to put insurance companies, coming from other States, into the same position as ours would be in the State whence they came." *Talbott v. Fidelity & Casualty Co.,* 74 Md. 536, 544, 22 A. 395 (1891); *State Insurance v. Nationwide,* 241 Md. 108, 115–16, 215 A.2d 749 (1966).

The nature and operation of the retaliatory tax was well-described by the United States Supreme Court in *Western & Southern L.I. Co. v. Bd. of Equalization,* 451 U.S. 648, 650–51, 101 S.Ct. 2070, 2073, 68 L.Ed.2d 514 (1981), a case involving the California counterpart to our § 61(1). Substituting "Maryland" for "California," we quote:

"[The statute] imposes a retaliatory tax on out-of-state insurers doing business in [Maryland], when the insurer's State of incorporation imposes higher taxes on [Maryland] insurers doing business in that State than [Maryland] would otherwise impose on the State's insurers doing business in [Maryland]. In computing the retaliatory tax owed by a given out-of-state insurer, [Maryland] subtracts the [Maryland] taxes otherwise due from the total taxes that would be imposed on a hypothetical similar [Maryland] company doing business in the out-of-state insurer's State of incorporation. If the other State's taxes on the hypothetical [Maryland] insurer would be greater than

[Maryland's] taxes on the other State's insurer, a retaliatory tax in the amount of the difference is imposed. If the other State's taxes on the hypothetical [Maryland] insurer would be less than or equal to [Maryland's] taxes, however, [Maryland] exacts no retaliatory tax from the other State's insurer."

As New York is Metropolitan's home State, the comparison, for purposes of the Maryland retaliatory tax, is between the aggregate tax burden imposed by New York and that imposed by Maryland.

The issue before us does not stem from an inequality between the *State* taxes imposed by Maryland and New York. Indeed, we are apprised that if Metropolitan had been the hypothetical Maryland company doing the same amount of business in New York in 1971 as it in fact did in Maryland, it would have paid less New York State premium tax than the actual Maryland premium tax.[1] The problem arises from a New York *City* premium tax, which existed in 1971 and was separate from and additional to the New York *State* tax.[2] The city tax was 0.4% of gross direct premiums allocable to New York City, *i.e.,* received on policies insuring risks located in the city.

Section 61(1) of art. 48A sets the amount of the Maryland retaliatory tax as the difference between the taxes imposed "pursuant to the laws of any other State" on Maryland insurers and the taxes imposed on "similar insurers . . . under the statutes of this State." It further provides,

---

1. For 1971, Metropolitan's gross direct premiums allocable to Maryland amounted to $76,564,427. If Metropolitan had been a Maryland company doing that amount of business in New York, the New York State tax on those premiums would have been $1,454,483. The actual Maryland tax, including some $2,700 in license and filing fees, was $1,534,003. The difference lies in the fact that for the first six months of 1971, the New York State tax on life insurance premiums was 1.75%, whereas the Maryland rate was 2%.

2. We are apprised that the New York City tax was subsequently repealed, which is why, for Metropolitan, the only year in dispute is 1971.

however that "[a]ny tax . . . imposed by any city, county, or other political subdivision . . . of such other state . . . on Maryland insurers . . . shall be deemed to be imposed by such state . . . within the meaning of this section."

The clear import of this provision is to regard the New York City tax as though it were a New York State tax for the purpose of calculating whether, and how much of, a Maryland retaliatory tax should be imposed. The problem is one of allocation. The city tax, as we have noted, was imposed only upon premiums on policies attributable to New York City; what would the burden of that tax have been on a hypothetical Maryland insurance company doing business in New York State?

Metropolitan argues that the statute (§ 61(1)) sets no standards or guidelines for making such an allocation; that is the basis of its "void for vagueness" argument. To the extent that it vests unbridled discretion in the Insurance Commissioner to develop an allocation formula, the statute, says the company, vests legislative taxing authority in an Executive official, in contravention of Md. Declaration of Rights, art. 8 (Separation of Powers).

The Insurance Commissioner acknowledges that the statute provides no specific method for allocating local taxes, and indeed suggests that, because of the myriad of possibilities that could arise depending on how many subdivisions within a State chose to enact such a tax and how the various local taxes were constructed, it might be impractical for the Legislature to write a particular formula or method into the law. Thus, he argues, this is an area that is particularly appropriate for administrative flexibility.

It must be kept in mind that whatever formula is used would be based on a hypothetical situation. Metropolitan is being taxed on its Maryland business, not its New York business, but at a rate that expresses what a hypothetical Maryland company would have to pay, in the aggregate, to New York State and New York City if it collected the same gross premiums in New York State as Metropolitan in fact

collected in Maryland. *The formula seeks to determine how much of the hypothetical Maryland company's total New York State premiums would be attributable to New York City policies and thus subject to the city tax.* Based on that, the New York City tax could be extrapolated into an effective Statewide rate that would then be added to the New York State tax rate.

The treatment of municipal taxes (in both the home State and foreign States) in the administration of the retaliatory tax law has been a particularly vexatious problem for many years. *See, for example, Report of the Special Committee on Insurance Taxation,* American Bar Association Section on Insurance Law (1939); Proceedings of the 72nd Annual Session of the National Association of Insurance Commissioners (1940); *The Problem of Retaliatory Taxation on Municipal Taxes and Fees,* National Association of Insurance Commissioners (1958); *Insurance Retaliatory Laws,* 39 Notre Dame Lawyer 243, 258–63 (1964). Most of the litigation in this area seems to have involved local taxes in the *home* State—*i.e.,* whether in comparing burdens for purposes of applying the retaliatory tax, a foreign insurance company was entitled to include local taxes in the home State as part of its aggregate home State burden. *See, for example, Pacific Mut. Life Ins. Co. v. Gerber,* 22 Ill.2d 196, 174 N.E.2d 862 (1961); *Firemen's Fund Ins. Co. v. Commissioner,* 325 Mass. 386, 90 N.E.2d 668 (1950); *Life & Cas. Ins. Co. v. Coleman,* 233 Ky. 350, 25 S.W.2d 748 (1930); *Commonwealth v. Firemen's Fund Ins. Co.,* 369 Pa. 560, 87 A.2d 255 (1952); *John Hancock Mut. Life Ins. Co. v. Pink,* 276 N.Y. 421, 12 N.E.2d 529 (1938). That, of course, is not our concern here.

Some of the difficulties in retaliating against local exactions in *foreign* States, which *is* our concern, were noted in the 1958 NAIC Report, *ante:*

"1. The municipal taxes and fees in a state do not constitute a simple specific overall tax levy like a state tax at 2 per cent but can be a multitude of exactions, differing

in rate or amount by community, county, parish or district.

2. Such levies can be upon the company, directly upon the agent of the company, or upon both.

3. Such levies can be by almost any municipal division of that state such as city, village, town, county or parish and in one isolated instance within our knowledge, by a school district.

4. There is question as to the legality of retaliation against such municipal levies under the normal retaliatory law.

5. There is difficulty of obtaining accurate information for use as a basis of retaliation.

6. The normal human reluctance of state department personnel makes them unwilling to undertake difficult added burdens of administration when most departments are, even now, understaffed.

7. There is apprehension on the part of domestic company personnel that such retaliation, even if legal, may provoke reprisals and antagonisms."

Despite these, and perhaps other difficulties, at least twenty-nine States, including Maryland, specifically include local taxes in foreign States as part of the aggregate tax burden imposed by those States for purposes of their own retaliatory tax.[3] Of those twenty-nine States, only two

---

**3.** Ala.Code § 27–3–29 (1975); Alaska Stat. § 21.09.270 (1966); Ariz. Rev.Stat.Ann. § 20–230 (Supp.1983); Ark.Stat.Ann. § 66–2225 (1980); Cal.Ins.Code § 685 (West 1972); Conn.Gen.Stat.Ann. § 12–211 (West 1983); Del.Code Ann. tit. 18, § 531 (1974); Fla.Stat.Ann. § 624.429 (West 1983); Ga.Code Ann. § 33–3–26 (1983); Idaho Code § 41–340 (1977); Ky.Rev.Stat.Ann. § 304.3–270 (Bobbs-Merrill 1983); Me.Rev.Stat.Ann. tit. 24A, § 428 (1974); Md.Code Ann. art. 48A, § 61(1) (1979); Mich.Comp.Laws Ann. § 500.476 (West 1983); Miss.Code Ann. § 27–15–123 (Supp.1983); Mo.Ann.Stat. § 375.916 (Vernon Supp.1983); Mont.Code Ann. § 33–2–709 (1983); Neb.Rev. Stat. § 44–150 (1978); Nev.Rev.Stat. § 680A.330 (1983); N.J.Stat. Ann. § 17B:23–5 (West 1983); Okla.Stat.Ann. tit. 36, § 628 (West 1976); Or.Rev.Stat. § 731.854 (1983); Pa.Stat.Ann. tit. 40, § 50 (Purdon Supp.1983); S.D.Codified Laws Ann. § 58–6–70 (Supp.1983); Tenn.Code Ann. § 56–4–218 (1980); Utah Code Ann. § 31–14–9

(Michigan and New Jersey) purport in the retaliatory tax statute itself to set forth a precise method for allocating the foreign local taxes on a Statewide basis.[4] The other twenty-seven, including Maryland, either say nothing at all in the statute as to how the local taxes are to be so allocated or, as in the case of Missouri and Tennessee, direct only that they be computed on an aggregate Statewide basis. The issues raised by Metropolitan in this case are thus not unique to Maryland; they have national implications. Unfortunately, there is no national (or Maryland) precedent. The only court that has apparently addressed the vagueness and delegation complaints squarely is a *nisi prius* court in Arizona, and the opinion of that court is unpublished. We obviously do not regard that decision, which was not appealed, as having any precedential value in Maryland.

There are, as Metropolitan points out, various formulae that could be used to convert the New York City tax, or any other local tax, into an aggregate Statewide ration. There are multiple substitutions that could be made for most of the elements in any given formula, each of which would produce a different end result. One could base the formula on the relationship between New York City and New York State population, or on the amount of business done in New York City and New York State by all insurers, all life insurers, life and casualty insurers, all Maryland insurers, Maryland life insurers, Maryland life and casualty insurers, all non-

---

(1974); Va.Code § 38.1–87 (1981); W.Va.Code § 33–3–16 (1982); Wyo.Stat. § 26–3–130 (1983).

4. The Michigan statute requires the Insurance Commissioner to compute the burden of a foreign State's local taxes "by dividing the total of such payments made by insurance corporations of this state in such state by the gross premium received by such corporations in such state less return premiums." Mich.Comp.Laws Ann. § 500.476 (1983). The New Jersey statute sets forth a similar formula, directing the Commissioner of Banking and Insurance to calculate the effective rate of the foreign State's local taxes by dividing the aggregate of the local tax obligations paid by New Jersey insurance companies in that State by "the aggregate of the taxable premiums [of New Jersey insurers] under the premium taxing statute of such State...." N.J.Stat.Ann. § 17B:23–5 (1983).

New York insurers, all non-New York life insurers, and so on. The formula chosen by the Maryland Insurance Commissioner follows essentially the approach taken by New Jersey and Michigan in their statutes and was initially suggested to the Commissioner for use in Maryland by the Attorney General in 1959. *See* 44 Op. Att'y Gen. 188 (1959), authored by C. Ferdinand Sybert and Shirley Brannock Jones.

In its simplest terms, the formula calculates the effect of the local tax by looking at the experience of *all* Maryland insurance companies doing business in New York State during the year in question (1971). It compares the total premium taxes actually paid by those companies to New York City with the total premiums which they earned throughout New York State that were subject to the New York State premium tax. In terms of Metropolitan, the formula proceeded thusly:

(1) The aggregate amount of New York City premium taxes paid by *all* Maryland insurers for 1971 ($129,038) was divided by the total amount of premiums received by those insurers in 1971 subject to the New York State premium tax ($99,269,092). The quotient (0.13%) was regarded as the effective burden of the New York City tax on the hypothetical Maryland insurer.

(2) That rate, 0.13%, was then applied to Metropolitan's Maryland premiums ($76,564,427), the product ($99,533) being regarded as the effect the New York City tax would have had on the hypothetical Maryland insurer doing the same business in New York State as Metropolitan did in Maryland.

(3) The $99,533 was then added to the New York State tax that would be payable by a Maryland insurer doing Metropolitan's business in New York State ($1,454,483) for an aggregate New York tax burden of $1,554,017.

(4) The actual Maryland premium taxes payable by Metropolitan for 1971 (including the minor license and filing fees) was $1,534,003.

(5) The aggregate New York taxes ($1,554,017) exceeded the Maryland taxes ($1,534,003) by $20,013. That was the amount of "retaliatory" tax assessed.

Metropolitan argues that because neither this formula nor any other method of allocation is specified in § 61(1) itself, "the Insurance Commissioner must disregard New York City tax in its entirety when determining Metropolitan's Maryland retaliatory tax liability for 1971." The company finds no particular fault with the Commissioner's formula itself— *i.e.,* it does not argue that the formula actually used is inconsistent with the statute or is arbitrary or irrational; it simply urges that *any* allocation criteria must be enacted by the Legislature, and that *no* formula adopted administratively by the Commissioner is or can be valid. Both prongs of Metropolitan's argument—that the statute is vague and that it improperly vests legislative authority in the Commissioner—arise from that underlying premise.

In considering these issues, it is well to start by looking precisely at what the General Assembly itself has done and what it has authorized or directed the Insurance Commissioner to do. In § 136 of art. 81, the Legislature has, as we have noted, imposed a specific premium tax on all insurers doing business in Maryland. The rate is fixed; the obligation and its method of calculation are clear. In § 61(1) of art. 48A, the Legislature has expressly directed the Commissioner to impose an additional levy on foreign insurers to the extent that their respective States of origin impose a tax burden on Maryland insurers that exceeds the burden which Maryland has otherwise imposed on them. Although the statute speaks in terms of the *Commissioner* imposing this additional levy, it seems clear from the context that the imposition is effectively made by the General Assembly; the Commissioner's authority is limited to ascertaining in each case what the respective burdens actually are. That is essentially a factual determination, from which the calculation of the additional levy becomes a matter of arithmetic.

The second sentence of § 61(1)—the one at issue here—is basically an adjunct to the first part of the statute. The Legislature has declared that, in computing the burden imposed by foreign States on Maryland insurers, local taxes "shall be deemed to be imposed by such state . . . within the meaning of this section." That is a clear legislative mandate that the Commissioner may not ignore. If there is such a local tax, the Commissioner must regard it as though it were imposed by the State. His discretion is limited to devising a method or formula for transmuting the local tax into an effective Statewide burden. That is a far cry from a delegation of the actual power to levy a tax, as was questioned in *National Cable Television Ass'n v. U.S.,* 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974).

There is, indeed, considerable and long-standing precedent for this type of delegation going back to the early days of our nation's history.

In *Marshall Field & Co. v. Clark,* 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892), the Supreme Court had before it an Act of Congress that permitted certain staple products to be imported without duty, but authorized the President, by proclamation, to "suspend" the free importing of those products if he

"be satisfied that the government of any country producing and exporting [those products] imposes duties or other exactions upon the agricultural or other products of the United States which in view of the free introduction of [the imported products] he may deem to be reciprocally unequal and unreasonable. . . ." *Id.* at 680, 12 S.Ct. at 500.

In the event of such a proclamation, those products would at once be subject to duties established in the statute until such time as the President withdrew the proclamation. Various importers, aggrieved by proclamations issued under the Act, challenged the statute as an unlawful delegation of both legislative and treaty-making powers.

After observing that Congress had delegated analogous types of authority to the President at least since 1794, the Court found that it was often desirable, if not essential, to protect "against the unfriendly or discriminating regulations established by foreign governments . . . to invest the President with large discretion in matters arising out of the execution of statutes relating to trade and commerce with other nations." *Id.* at 691, 12 S.Ct. at 504. Recognizing that Congress cannot lawfully delegate legislative authority to the President, the Court concluded that the Act in question "does not, in any real sense, invest the President with the power of legislation." His authority was limited to "examin[ing] the commercial regulations of other countries producing and exporting [the enumerated products] and form[ing] a judgment as to whether they were reciprocally equal and reasonable, or the contrary, in their effect upon American products" and deciding how long any suspension should remain in effect. *Id.,* 692–93, 12 S.Ct. at 504. In this regard, the Court held, "[w]hat the President was required to do was simply in execution of the Act of Congress. It was not the making of law." *Id.,* 693, 12 S.Ct. at 504.

The Court drew the distinction between proper and improper delegations by reference to two State court decisions, the reasoning of which it adopted. Quoting first from *Cincinnati, W. & Z.R. Co. v. Clinton County,* 1 Ohio St. 77, 88 (1852), the Court observed:

"The true distinction, therefore, is, between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first can not be done; to the latter no valid objection can be made."

In line with that, the Court, quoting from *Locke's App,* 72 Pa. 491 (1873) concluded:

"The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this

would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which cannot be known to the law making power, and, must, therefore, be a subject of inquiry and determination outside of the halls of legislation."

Thirty-six years later, the Court reaffirmed these principles in *Hampton & Co. v. United States,* 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (1928), a case that is close on point to the one now before us. At issue there was the validity of a provision of the tariff law that authorized the President, by proclamation, to increase or decrease the statutory rate on certain products by up to 50% in order to equalize any difference that he found to exist between the cost of producing the items in the United States and the cost of producing them in the exporting country. The law directed that an investigation of the relevant production costs be made by the U.S. Tariff Commission before the President could issue such a proclamation, but he was not bound by the Commission's findings. The case arose as the result of a Presidential proclamation increasing the tariff on barium dioxide from the statutory rate of four cents per pound to six cents per pound, the importer's argument being that this scheme represented an unlawful delegation to an Executive official of the Congressional power to tax.

The Court rejected that argument. The intent of Congress, it said, was not only to raise revenue, but to enable domestic producers to compete on terms of equality with foreign producers by taking into account the differences in production costs. However:

"Because of the difficulty in practically determining what that difference is, Congress seems to have doubted that the information in its possession was such as to enable it to make the adjustment accurately, and also to have apprehended that with changing conditions the difference might vary in such a way that some readjustments would be necessary to give effect to the principle on which the statute proceeds. To avoid such difficulties, Congress adopted . . . the method of describing with clearness what

its policy and plan was and then authorizing a member of the executive branch to carry out its policy and plan and to find the changing different from time to time and to make the adjustments necessary to conform the duties to the standard underlying that policy and plan." 276 U.S. at 405, 48 S.Ct. at 350.

That kind of delegation was not improper; it was no different than the delegations embodied in the various statutes regulating interstate commerce, which had previously and consistently been approved by the Court. Thus: "If Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to fix such rates is directed to conform, such legislative action is not a forbidden delegation of legislative power."

The delegation at issue—"vary[ing] the custom duties according to changing conditions of production at home and abroad"—did not violate that standard. 276 U.S. at 409, 48 S.Ct. at 352.

The standard laid down in *Hampton* has been cited and applied numerous times since 1928. *See, for example, Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796 (1933); *Opp Cotton Mills, Inc. v. Administrator,* 312 U.S. 126, 61 S.Ct. 524, 85 L.Ed. 624 (1941); *National Cable Television Ass'n v. U.S., supra,* 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370; *Consumer Energy, Etc. v. F.E.R.C.,* 673 F.2d 425 (D.C.Cir.1982), *aff'd* —— U.S. ——, 103 S.Ct. 3556, 77 L.Ed.2d 1402, 1403, 1413, *reh. denied* —— U.S. ——, 104 S.Ct. 40, 77 L.Ed.2d 1457 (1983); *Amalgamated Meat Cutters v. Connally,* 337 F.Supp. 737 (D.D.C. 1971); *United States Cane Sugar Refiners' Ass'n v. Block,* 544 F.Supp. 883, 3 C.I.T. 196, *aff'd* 683 F.2d 399 (C.C.P.A. 1982); *NAACP Legal Defense & Educational Fund v. Devine,* 560 F.Supp. 667 (D.D.C.1983); *Mulroy v. Block,* 569 F.Supp. 256 (N.D.N.Y.1983); *Avant v. Clifford,* 67 N.J. 496, 341 A.2d 629, 660 (1975); Annot., *Permissible Limits of Delegation of Legislative Power,* 79 L.Ed. 474.

It has been noted more than once that since the 1935 decisions in *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, and *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 "no federal court has held a statute unconstitutional based on excessive delegation", *Mulroy v. Block, supra,* 569 F.Supp. 256, 263, and cases cited therein, leading some courts and commentators to suggest that the restraints on legislative delegation implicit from the separation of powers doctrine "has been virtually abandoned by the [Supreme] Court for all practical purposes." *FPC v. New England Power Co.,* 415 U.S. 345, 353, 94 S.Ct. 1151, 1156, 39 L.Ed.2d 383 (1974) (Marshall, J., concurring). *Compare,* however, *National Cable Television Ass'n v. U.S., supra,* 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370. As Professor Davis points out (*Administrative Law Treatise,* 2d ed., §§ 3:1, 3:2):

"Congress may and does lawfully delegate legislative power to administrative agencies. The Supreme Court has *said* many times—more than a hundred—that standards are required, but it has often *held* that standards are not required. The Supreme Court throughout the twentieth century has upheld congressional delegations without standards, and except for two 1935 decisions, it has never held unconstitutional any delegation to an administrative agency. Since 1935 the nondelegation doctrine has had no reality in the holdings, although remnants of the doctrine persist in judicial verbiage. [§ 3:1]

\*     \*     \*     \*     \*     \*

The doctrine that legislative bodies may not lawfully delegate their power to administrative agencies has failed in the federal courts. The reason the doctrine has failed is quite simple: The kind of government we have could not function without such delegation. [§ 3:2]" (Emphasis in the original.)

Whether dead or merely ailing in the Federal system, the proscription against the unbridled delegation of legislative authority is not entirely moribund in Maryland. In *Truitt v.*

*Board of Public Works,* 243 Md. 375, 388, 221 A.2d 370 (1966), the Court of Appeals reaffirmed that "[t]he failure to provide *any* standards for the exercise of administrative discretion has been held to render the delegation of authority to the agency invalid." (Emphasis supplied.) *See also County Council v. Investors Funding,* 270 Md. 403, 441–43, 312 A.2d 225 (1973).

Though reaffirming the principle, the Court of Appeals, in recent years, has been nearly as loath as the Supreme Court to apply it in such manner as actually to invalidate a legislative delegation. *Truitt,* indeed, provides an excellent example of that reluctance. The liberal approach taken long ago by the Supreme Court in dealing with Acts of Congress was presaged in Maryland in *Givner v. Com'r of Health of Baltimore City,* 207 Md. 184, 113 A.2d 899 (1955), and enunciated more fully in *Pressman v. Barnes,* 209 Md. 544, 121 A.2d 816 (1956). In *Governor v. Exxon Corp.,* 279 Md. 410, 440–41, 370 A.2d 1102 (1977), *aff'd* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 *reh. denied* 439 U.S. 884, 99 S.Ct. 233, 58 L.Ed.2d 200 (1978), the Court observed:

> "Ordinarily when legislative authority is delegated to administrative officials, there must be sufficient standards for the guidance of the administrative officials. However, it has been recognized that the complexity of modern economic conditions may make it impossible to tailor specific guidelines for every conceivable situation and that latitude in granting discretion is necessary. As stated in *Pressman v. Barnes,* 209 Md. 544, 555, 121 A.2d 816 (1956):
>
> > 'It is recognized that it would not always be possible for Legislature or City Council to deal directly with the multitude of details in the complex situations upon which it operates.... The modern tendency of the courts is toward greater liberality in permitting grants of discretion to administrative officials in order to facilitate the administration of the laws as the complexity of governmental and economic conditions increases.' "

*See also Montgomery County v. Walsh,* 274 Md. 502, 523–24, 336 A.2d 97 (1975), *appeal dismissed* 424 U.S. 901, 96 S.Ct. 1091, 47 L.Ed.2d 306 (1976).

Metropolitan acknowledges the tendency reflected in *Pressman v. Barnes* and *Governor v. Exxon Corp.* to allow greater latitude in legislative delegation, a tendency which Davis suggests is nationwide among State courts (*Administrative Law Treatise, supra,* § 3:14), but argues that such liberality is confined to regulatory statutes and does not apply to tax laws. We find neither authority nor justification for such a distinction. The Supreme Court expressly rejected that kind of argument in *Hampton & Co. v. United States, supra,* 276 U.S. at 409, 48 S.Ct. at 352, and for good reason. The complex and varying fact patterns that justify administrative flexibility in implementing regulatory statutes are also a problem in the enforcement of tax laws, as witness the myriad of regulations and administrative rulings by the Internal Revenue Service and, in Maryland, by the Comptroller of the Treasury. *See* COMAR, Title 03.

Upon this authority, we find neither an unconstitutional vagueness nor an improper delegation in § 61(1). The Legislature has told the Insurance Commissioner to regard local taxes as though they were imposed by the State, and, as twenty-six other State legislatures have done, has left it to him to determine the most appropriate method of doing so. That is not, in our judgment, a delegation of the power to *make* law, but rather the authority to implement and enforce the expressed legislative will.

As a parting shot, Metropolitan argues that, even if the Commissioner has the power to select an appropriate formula, he is bound to exercise that power by adopting a regulation. Metropolitan cites no authority for that proposition and we know of none.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.